**SOCIETE NATIONALE d'EXPLOITA-TION INDUSTRIELLE des TABACS et ALLUMETTES, Plaintiff,**

v.

**SALOMON BROTHERS INTERNATION-AL LIMITED, Salomon Brothers Inc. and Salomon Brothers Holding Company, Inc., Defendants.**

95 Civ. 9484 (RWS).

United States District Court, S.D. New York.

June 26, 1996.

---

Proskauer Rose Goetz & Mendelsohn, New York City (Edward Brodsky, of counsel), for Plaintiff.

Cravath, Swaine & Moore, New York City (Francis P. Barron, of counsel), for Defendants.

## *OPINION*

SWEET, District Judge.

In this action brought pursuant to Sections 12(2) and 17 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77b, 77q, Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, Sections 4b and 4o of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 6b(a)(2), 6o, Section 32.9 of the rules of the Commodity Futures Trading Commission (the "CFTC"), 17 C.F.R. 32.9, and related state law claims, Defendants Salomon Brothers International Limited ("SBIL"), Salomon Brothers Inc. ("SBI") and Salomon Brothers Holding Company, Inc. ("SBHC") (collectively, "Salomon" or the "Defendants") have moved, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b) to dismiss the Complaint of Plaintiff Société Nationale d'Exploitation Industrielle des Tabacs et Allumettes ("SEITA"). For the reasons set forth below, the motion will be granted and the case dismissed.

### *Parties*

SEITA, a French corporation with its principal place of business in Paris, manufactures and markets tobacco products. (Compl. ¶¶ 1,

21.) SEITA was wholly state-owned from the inception of its relationship with Salomon through early 1995. (Compl. ¶¶ 21, 23.)

SBIL, an English corporation with offices in London, and SBHC and SBI, both Delaware corporations with offices in New York, are affiliated entities. Some or all of SBIL, SBHC, and SBI conduct at least some business through an office in Tampa, Florida.

### Prior Proceedings

SEITA filed its Complaint in this action on November 7, 1995. On January 10, 1996, Defendants filed their notice of the instant motion. The matter was argued on April 24, 1996, and further letter submissions were accepted from the parties through May 31, 1996, at which time the matter was deemed fully submitted.

### Facts

The facts as presented here are drawn from the Complaint and do not represent findings of fact by the Court. In late 1993, after providing investment advice to SEITA over a number of years (Compl. ¶¶ 11, 14, 23–28, 99–102), Salomon, through its representative Gilles Albou ("Albou") in the London office of SBIL, proposed to SEITA's then-treasurer, Marc Tardieu ("Tardieu"), that SEITA invest in two financial products. Albou described these products as being very good investments from which SEITA could make millions of dollars. (Compl. ¶ 30.) The products Albou suggested were the Swap Transactions, one based on the deutsche mark interest rate (the "DEM Swap"), and the other based on the exchange rate between the United States dollar and Japanese yen (the "USD/JPY Swap"). Unbeknownst to SEITA, the Swap Transactions were far riskier than any of the prior investments SEITA had done with Salomon over the years. (Compl. ¶ 30.) After Albou had aggressively promoted the Swap Transactions to Tardieu, Tardieu agreed to them, based upon Albou's representations that (a) the risk of loss to SEITA was very small because of the range of the DEM interest rate and the USD/JPY exchange rate that would be part of the terms of the Swap Transactions, as structured by Salomon, and (b) if at any time it appeared that SEITA's principal would be at risk, Salomon would get SEITA out of the

Swaps at minimal cost to SEITA. (Compl. ¶ 32.) Tardieu relied completely on the integrity of Salomon, as an investment and financial advisor to SEITA, concerning the benefits and risks, of the Swap Transactions, as well as the fairness of their terms and pricing. (Compl. ¶¶ 39–40.)

Unlike other securities or commodities, derivative swaps are not traded on an exchange. Current market prices of derivatives are not publicly available, and assessing their underlying merits, risks and potential rewards is impossible for companies such as SEITA whose business is not based on trading in such instruments. Fixing a current price or value on a derivative swap is done by the designers and sellers of derivatives, like Salomon, a "major participant in markets for derivative instruments," who use sophisticated and complex computer models to perform the task. (Compl. ¶¶ 33, 34.)

Salomon failed to disclose to SEITA, *inter alia*, (a) the scope of the downside risks to SEITA posed by the Swap Transactions, (b) that Salomon was acting not as a broker and advisor to SEITA on the Swaps, but instead as the counterparty that stood to gain from losses suffered by SEITA, (c) that Salomon had structured the Swap Transactions disproportionately in its favor and against the interests of its customer, SEITA, and (d) that Salomon had access to computer models evaluating the risks and rewards of the Swaps, which Salomon would not make available to SEITA. (Compl. ¶¶ 37, 38, 103.)

Based upon Albou's representations to Tardieu, the DEM Swap was executed on or about January 31, 1994, and the USD/JPY Swap was executed on or about February 22, 1994. (Compl. ¶¶ 43, 46.) The DEM Swap was restructured once, on March 21, 1994. The USD/JPY was restructured twice, once on March 4, 1994, and once on April 19, 1994. The restructuring altered certain terms of the Swaps in ways that were supposed to benefit SEITA. (Compl. ¶¶ 50–53.) Each written agreement confirming the original and restructured Swaps, which were prepared by Salomon, stated that questions concerning the transaction could be directed to the "Swap Operations Department" in Tam-

pa, Florida, at a phone number provided. (Compl. ¶¶ 49, 54.)

Salomon proposed other restructurings and modifications, through December 1994, supposedly to benefit SEITA. These proposals were not adopted. (Compl. ¶¶ 56, 69.) In connection with one of those proposals, Salomon represented that it would "immunize [SEITA] for the downside" of the USD/JPY Swap, and that SEITA "would keep the upside on that trade."

No payments were made by SEITA when the Swaps were executed or at any time prior to the termination of the Swaps in December 1994/January 1995. At termination, Salomon and SEITA were to "swap" payments, which would then be netted. SEITA's payment on each Swap was a fixed amount—$20 million on the USD/JPY Swap, and $35 million on the DEM Swap. Salomon's payment was calculated by an equation tied to a fluctuating reference rate—the interest rate on the deutsche mark on the DEM Swap, and the dollar/yen exchange rate on the USD/JPY Swap. (Compl. ¶¶ 43–44, 46–47, 51–53.)

Tardieu had no authority to enter into the Swap Transactions without prior approval from his superiors, which approval he neither sought nor received. (Compl. ¶ 60.) Salomon knew or should have known of Tardieu's lack of authority due, *inter alia*, to the extremely risky nature of the Swaps, the large amount ($55 million) at risk for SEITA in the two transactions, and the fact that government funds were at stake. (Compl. ¶¶ 23, 62.) No one at Salomon ever made an attempt to speak to any officer of SEITA other than Tardieu to disclose the nature of the Swap Transactions. (Compl. ¶ 67.)

On April 11, 1994, Salomon sent a letter, in English, addressed to SEITA's financial director, Gilbert Dupont ("Dupont"), by which Salomon stated it was enclosing copies of confirmations on two "structured transactions." The letter asked Dupont to acknowledge receipt of the letter. The letter neither (a) described the nature of the transactions, (b) indicated that SEITA was in negative positions on them, nor (c) requested authorization for the Swap Transactions. Not knowing the nature of the transactions re-

ferred to in the letter, and having only a rudimentary knowledge of English, Dupont signed the acknowledgement of receipt. (Compl. ¶ 66.)

On December 12, 1994, Tardieu had $5,006,000 of SEITA's funds transferred to Salomon in partial termination of the USD/JPY Swap. This amount was transferred, pursuant to Salomon's direction, to an SBIL account in New York. (Compl. ¶ 78.) On December 19, 1994, for the first time, Tardieu alerted his superiors to the existence of the Swap Transactions and SEITA's severe negative positions on those transactions. Tardieu was relieved of his duties, and SEITA began to investigate the facts and circumstances surrounding the Swap Transactions. (Compl. ¶ 71.) Some time after the Swap Transactions were terminated, Albou resigned from Salomon. (Compl. ¶ 77.)

On or about January 10, 1995, at SEITA's request, representatives of SEITA and Salomon met to discuss concerns of SEITA's management about the Swap Transactions. At the end of that meeting, a Salomon officer stated that he would undertake to listen to tape recordings Salomon had of Albou's telephone conversations with Tardieu, and examine documents relating to the Swaps, to determine whether the transactions took place in conformity with customary practices. Two days later, that same Salomon officer contacted SEITA and stated that his review had not uncovered any breach of responsibility on Salomon's part in connection with the Swaps. (Compl. ¶¶ 72–75.)

On January 19, 1995, the remainder of the USD/JPY Swap terminated by its terms with an additional loss to SEITA of USD $14,970,-000, which amount SEITA transferred to an SBIL account in New York, as Salomon instructed. (Compl. ¶ 79.) It was from Salomon's Tampa office that SEITA received payment instructions with respect to the USD/JPY Swap. These instructions included how and where payment should be made, the amount to be remitted, and a statement of how that amount was calculated, which specified the USD/JPY spot rate Salomon was using for each day of the operative period. (Compl. ¶ 80.) On January 20, 1995, the

DEM Swap was terminated with a loss to SEITA of $9,800,000, which amount SEITA transferred to an SBIL account in New York, pursuant to Salomon's instructions. (Compl. ¶ 81.) In total, SEITA lost $29,776,-000 to Salomon on the Swap Transactions. (Compl. ¶ 83.)

Beginning in June 1995, SEITA, through its counsel, repeatedly asked Salomon to provide SEITA access to the tapes and documents reviewed by Salomon and from which it purportedly concluded it had fulfilled its responsibilities with respect to the Swaps. Salomon refused to comply with those requests. (Compl. ¶ 76.)

### The Complaint

SEITA asserts claims under New York law for breach of fiduciary duty (Count I); fraudulent misrepresentation (Count II); reckless misrepresentation (Count III); negligent misrepresentation (Count IV); negligence (Count V); rescission and restitution based on lack of authorization (Count VI); rescission and restitution based on illegality (Count VII); unjust enrichment (Count VIII); violation of Section 12(2) of the Securities Act, 15 U.S.C. § 77b (Count IX); fraudulent sale of a security under Section 17 of the Securities Act, 15 U.S.C. § 77q (Count X); violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder (Count XI); willful deceptions, fraud and cheating in violation of Section 4b of the CEA, 7 U.S.C. § 6b(a)(2) (Count XII); scheme or artifice to defraud in violation of Section 4o of the CEA, 7 U.S.C. § 6o (Count XIII); and deception, cheating and fraud in violation of Section 32.9 of the rules of the CFTC, 17 C.F.R. § 32.9 (Count XIV).

### Discussion

Because no federal question is presented under the federal laws under which jurisdiction is asserted, and because no diversity jurisdiction is asserted, the Court lacks subject matter jurisdiction, and the federal law claims will be dismissed. The state law claims will, therefore, be dismissed as well, pursuant to 28 U.S.C. § 1367(c)(3) and *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ The burden of proving subject matter jurisdiction is on the party asserting it. *E.g., Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). "[A]rgumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l, Ltd.*, 968 F.2d 196, 198 (2d Cir.1992) (citations omitted). On a Rule 12(b)(1) motion, the Court need not accept as true contested jurisdictional allegations and may resolve disputed jurisdictional facts by reference to affidavits and other material outside the pleadings. *E.g., Antares Aircraft, L.P. v. Federal Republic of Nig.*, 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds*, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992) (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986); *Weltover, Inc. v. Republic of Arg.*, 753 F.Supp. 1201, 1203 n. 2 (S.D.N.Y.), *aff'd*, 941 F.2d 145 (2d Cir.1991), *aff'd*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465, 1468 (S.D.N.Y.1984), *aff'd*, 762 F.2d 222 (2d Cir.1985)).

■ The securities and commodities laws are silent regarding the issue of extraterritorial jurisdiction. *See, e.g., Alfadda v. Fenn*, 935 F.2d 475 (2d Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991). Therefore, when faced with transactions that are "predominantly foreign," the Court "must seek to determine whether Congress would have wished the precious resources of United States courts ... to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.) (Friendly, J.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Thus, in meeting Congress's intent not "to allow the United States to be used as a base for manufacturing fraudulent security devices for export," *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir.1975), "[t]he issue then is whether the fraud alleged has sufficient contacts with the United States to invoke the federal securities and commodity laws or whether it is 'predominantly foreign' in nature." *Mormels v. Girofinance, S.A.*, 544 F.Supp. 815, 817 (S.D.N.Y.1982) (Weinfeld, J.).

Courts in this Circuit employ two tests to determine whether subject matter jurisdiction exists: the "conduct test" and the "effects test." *E.g., Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121–22 (2d Cir.1995), *cert. denied,* —— U.S. ——, —— U.S. ——, 116 S.Ct. 702, 116 S.Ct. 703, 133 L.Ed.2d 659, —— L.Ed.2d —— (1996). Because SEITA has not alleged that Defendants' alleged acts bore effects in the United States, only the conduct test need be considered.

■ Under the conduct test, subject matter jurisdiction over securities claims asserted by aliens exists only where there has been in the United States: (1) "conduct material to the completion of the fraud," *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983); (2) "perpetration of the fraudulent acts themselves," *IIT,* 519 F.2d at 1017; or (3) the "final steps in the fraudulent scheme," *Cresswell v. Prudential–Bache Secs. Inc.,* 580 F.Supp. 55, 58 (S.D.N.Y.1984). Subject matter jurisdiction does not exist where activities in the United States are "merely preparatory"; "are relatively small in comparison to those abroad," *Bersch,* 519 F.2d at 987; are "far removed from the consummation of the fraud," *Psimenos,* 722 F.2d at 1046; or are "secondary," "ancillary," or "tertiary," *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.,* 606 F.2d 5, 8 (2d Cir. 1979) (upholding as "entirely correct" these descriptions by the district court). Put another way, "where defendants have undertaken *significant steps* in the United States in furtherance of a fraudulent scheme, United States courts have jurisdiction over suits arising from that conduct even if the final transaction occurs outside the United States and involves a foreign plaintiff." *Carr v. Equistar Offshore, Ltd.,* No. 94 Civ. 5567 (DLC), 1995 WL 562178 (S.D.N.Y. Sept. 21, 1995) (citing *Alfadda,* 935 F.2d at 478–79 (quoting Restatement (Second) of Foreign Relations Law of the United States § 416(d) (1987)); *Bersch,* 519 F.2d at 993) (emphasis added). The principles governing extraterritorial jurisdiction of the securities laws are applicable in deciding the same issue under the commodities laws. *E.g., Psimenos,* 722 F.2d at 1044; *Mormels,* 544 F.Supp. at 817 n. 8 (S.D.N.Y.1982). In sum, to satisfy the conduct test, SEITA must demonstrate that the defendants' United States-based activities "directly caused" its financial losses. *E.g., Itoba,* 54 F.3d at 122; *Psimenos,* 722 F.2d at 1047.

The allegations of the Complaint fail to satisfy the conduct test, and the affidavits, therefore, need not be addressed. The clear gravamen of the Complaint is that SEITA, a French corporation, was defrauded by SBIL, an English corporation, through acts that occurred in France or England and had their only effect in France. The alleged fraudulent conduct that "directly caused" SEITA's losses occurred outside the United States.

■ The Swaps themselves are not alleged to have been a fraudulent instrument. Instead, the Complaint alleges that SEITA entered into the Swaps in reliance upon fraudulent representations made by Albou, an SBIL employee located in London, and that, had such alleged misrepresentations not been made, SEITA would not have entered into the Swaps. (Compl. ¶¶ 32, 43, 45.) Thus, the alleged fraud occurred before or upon the execution of the Swaps. SBIL marketed the Swaps to SEITA from London (Compl. ¶ 95), and Albou was responsible for "the bulk of the communications" with SEITA (Compl. ¶ 29.) No other person is alleged to have induced SEITA to enter into the Swaps. As a French corporation headquartered in Paris (Compl. ¶ 1), SEITA relied on the alleged misrepresentations, executed the Swaps, and realized its losses in Paris.

Although the Complaint refers to activity in the Tampa office, none of the allegations describes conduct within the United States that can be read to have "directly caused" SEITA's losses or to have been anything more than "preparatory," "ancillary," or "secondary" activities in the United States. Instead, the alleged fraudulent conduct that "directly caused" SEITA's losses consisted of inducing SEITA to enter into the Swaps through allegedly false or misleading information—all of which occurred abroad. Although activity relating to the Swaps occurred in the United States, it was incidental to what was done in London, did not constitute fraud, and did not "directly cause" SEITA's losses.

SEITA counters that the Complaint alleges an involvement of the United States offices that goes to the "very heart of the fraud" (Def.Mem. at 16): structuring the terms, pricing and valuation of the Swap Transactions in such a way that they disproportionately favored Salomon over SEITA, and failing to disclose that fact to SEITA.

Yet these allegations are far from the heart of the Complaint. The gravamen of the purported federal claims asserted by SEITA can only be read as fraud in the inducement. The alleged fraud consists of allegations that: 1) Albou of SBIL "proposed" the Swaps, which he "described as being very good investments," to SEITA (¶ 30); 2) Albou (upon information and belief) had a personal financial motive for doing so (¶ 31); 3) Tardieu resisted at first, but agreed to the Swaps after "repeated calls from Albou aggressively promoting the transactions" (¶ 32); 4) Tardieu told Albou that SEITA "could not enter into any transaction in which any material portion of the principal it invested would be at risk," and Albou "stated that he understood this" (¶ 32); 5) Albou "represented to Tardieu that the risk of loss to SEITA was very small because of the range of the DEM interest rate and USD/JPY exchange rate that would be part of the terms of the Swap Transactions," and also "assured Tardieu that, if at any time it appeared that the principal SEITA invested was at risk, Salomon would get SEITA out of the Swaps at minimal cost to SEITA" (¶ 32); 6) had Albou "not made these representations, Tardieu would not have entered into the Swap Transactions." (¶ 32.)

No other communications are alleged to have induced SEITA to enter into the Swaps, and the Swaps themselves are not alleged to have been fraudulent. Complaint ¶ 95 confirms that "Salomon's London office" was the one that "marketed the Swap Transactions to SEITA." Neither does the Complaint indicate that anyone other than Albou made any of the alleged statements that induced SEITA to enter into the Swaps. The Complaint does not allege statements made in the United States that induced SEITA to enter into the Swaps.

The alleged fraud described in the Complaint was, as a matter of law, consummated at the point in time when, having been induced by the alleged misrepresentations of SBIL's Albou, Tardieu executed the Swap agreements. As this Court held in *Cresswell,* 580 F.Supp. at 58, the "final step" in a securities fraud scheme occurs upon the execution of the fraudulently induced transaction.

SEITA notes that Paragraph 20 of the Complaint alleges that "Salomon's Tampa, Florida office, with possible assistance from Salomon's New York office, was responsible in whole or in part for the terms, pricing and valuation of the Swaps." Paragraph 38 of the Complaint alleges that Salomon had a financial incentive "to structure the Swap Transactions disproportionately in Salomon's favor and against the interests of its customer, SEITA," and that "Salomon did not disclose to SEITA that Salomon had such an incentive."

These allegations, however, do not provide jurisdiction. The gravamen of the alleged fraud is not in the structuring of the Swaps, but in the misrepresentation of them as low-risk. The Complaint does not allege that statements in the Swap agreements themselves are false or misleading. Rather, SEITA claims that Albou misrepresented the risk involved in the Swaps and thereby fraudulently induced SEITA to enter into them.

Even allegations that the Swap agreements themselves were false and misleading and that they had been structured in Tampa might present no basis for jurisdiction. Under those circumstances, this case would be analogous to *Bersch,* in which the defendants and others "met in New York on numerous occasions to initiate, organize and structure the offering" at issue, *Bersch,* 519 F.2d at 985 n. 24, and in which Judge Friendly wrote for the Court of Appeals:

Assuming that there were no American purchasers and that the underwriting related, for example, to a large foreign industrial company clearly identified with a foreign country rather than with the United States, *e.g.,* Rolls–Royce, Mercedes–Benz, or Fiat, we do not believe the activities in

the United States ... would justify an American court in taking jurisdiction in a suit for damages by foreign plaintiffs. The fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands.... At most the acts in the United States helped to make the gun whence the bullet was fired from places abroad; alternatively proper action in the United States would have prevented the gun's ever being sent abroad. We are indeed holding in *IIT v. Vencap Ltd.*, 519 F.2d 1001 (2d Cir.1975), decided this day, that Congress did not mean the United States to be used as a base for fraudulent securities schemes even when the victims are foreigners, at least in the context of suits by the SEC or by named foreign plaintiffs. But as we there point out, that holding itself goes beyond any case yet decided, and we see no reason to extend it to cases where the United States activities are merely preparatory or take the form of culpable nonfeasance and are relatively small in comparison to those abroad.

*Id.* at 986–87 (citations and footnotes omitted). Thus, even the most generous interpretation of SEITA's assertions concerning Tampa merely establishes that "acts in the United States helped to make the gun whence the bullet was fired from places abroad." As *Bersch* holds, that is not enough to establish jurisdiction.

Similarly, Judge Friendly's reasoning in *Bersch* suggests that jurisdiction cannot be founded on the failure of United States offices to make disclosures to SEITA regarding the alleged fraud perpetrated in London. An allegation that "proper action in the United States would have prevented the gun's ever being sent abroad" is not sufficient, nor are United States activities that "take the form of culpable nonfeasance and are relatively small in comparison to those abroad." *Bersch*, 519 F.2d at 987; *see also IIT*, 519 F.2d at 1018 ("[o]ur ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries, such as in *Bersch* ").

The Complaint cites a facsimile sent from Tampa directly to SEITA on January 19, 1995, which set forth the amount SEITA was to pay Salomon upon termination of the USD/JPY Swap, detailing how that amount was reached and providing payment instructions. (Compl. ¶¶ 20, 80) As *Cresswell* makes clear, the fraud in a case such as this is complete upon execution of the transaction. 580 F.Supp. at 58. The "final step" here was the execution of the Swaps in London and Paris. The faxed payment instructions were received at least nine months after SEITA had been induced to enter into the transactions, at least eight months after SEITA (according to its own allegations) had learned that it had a $29 million loss position in the Swap—and, thus (necessarily), that the Swaps were not low risk (Compl. ¶¶ 51, 52, 57)—and after SEITA had already paid over $5 million in partial termination of one of the Swaps without ever having received any payment instructions from the United States. (Compl. ¶ 78.) Under these circumstances, the faxed payment instructions cannot be deemed to have been "critical." Applying the Court of Appeals' formulations, the faxed payment instructions did not constitute either "perpetration of the fraudulent acts themselves" or "conduct material to the completion of the fraud"; rather, viewing the allegations regarding the facsimile in the context of the allegations of the Complaint as a whole, they were "relatively small in comparison to those abroad," "far removed from consummation of the fraud," and "secondary," "ancillary," or "tertiary." The facsimile was, " 'relatively minor' and of a 'secondary' nature and do[es] not detract from the fact that the core of the primary fraud was centered and committed in [London] and not the United States." *Mormels*, 544 F.Supp. at 818. The facsimile does not alter the conclusion that the Swaps were transactions that were " 'predominantly foreign.' " *Id.* at 817.

SEITA asserts that the involvement of Salomon's United States offices in the pricing and valuation of the Swaps can be seen by mark-to-market calculations received by SEITA from Salomon on a periodic basis from April through December 1994, which set forth SEITA's position on the Swaps.

Certain of these statements bore disclaimer or disclosure statements of SBI (Compl. ¶ 58), and SEITA argues that these strongly suggest that the calculations were prepared in the United States. Yet the "mark-to-market calculations" do not support jurisdiction, since as with the faxed payment instructions, they are not the kind of conduct—central to perpetration of the alleged fraud—that support jurisdiction in a United States federal court.

Further evidence of United States involvement in the Swaps, argues SEITA, can be seen by the letters sent and prepared by Salomon confirming or restructuring the Swap transactions. Each of those letters is alleged to have stated that any questions concerning the transactions could be directed to "the Swap Operations department" in Tampa. (Compl. ¶ 49, 54.) Thus, contends SEITA, it is clear from this statement that the Tampa office was integrally involved in and had detailed knowledge of the Swaps and was authorized to disclose information concerning the Swaps to SEITA. The Swap Confirmations, argue SEITA, represent the Tampa office as a "department" of SBIL, which supports SEITA's allegation that SBIL conducts business in the United States through the Tampa office.

Yet the letters were sent after the Swap transactions had been executed; that is, after the alleged fraud in the inducement had been consummated in London. Under the circumstances the letters advising plaintiff to direct questions concerning operational matters to Tampa cannot be deemed to support the existence of federal jurisdiction. Defendants' back-office operations are not alleged to have been involved in the "perpetration of the fraudulent acts themselves"; were "far removed from consummation of the fraud"; were "relatively small in comparison to those abroad"; did not "directly cause" any of plaintiff's losses; and are properly characterized as "secondary," "ancillary," or "tertiary."

SEITA also cites as evidence of the likelihood of significant interaction between SBIL and Salomon's United States offices relating to the Swap Transactions the statements made by Salomon in a preliminary placement memorandum sent to SEITA concerning Salomon's EMS Strategies Fund, which described SBIL's function in Salomon's global network as "a London affiliate" of SBI. (Compl. ¶ 17.)

Yet SEITA's investment in the EMS Strategies Fund was a 1990 transaction that was unrelated to the Swaps. (Compl. ¶ 24.) Under the Second Circuit's conduct test, such interaction is insufficient to support subject matter jurisdiction.

Our Court of Appeals' decision in *Bersch*, discussed above, is instructive. In that case, the alleged fraud occurred upon the placing of a prospectus in the hands of the purchasers, which occurred abroad. *Bersch*, 519 F.2d at 987. The Court concluded that even where various physical meetings among the issuer, underwriters, accountants and SEC officials discussing the offering took place in the United States, they were at most "preparatory." *Id.* Similarly, the fraud here occurred upon SBIL's alleged inducement of SEITA to enter into the Swaps, which occurred in London and Paris.

In sum, it is not enough to assert that offices or entities in the United States had only some involvement in the transactions at issue. To support the assertion of federal jurisdiction, the plaintiff must put forward allegations of conduct in the United States of sufficient centrality to the claim of fraud to warrant an exercise of such jurisdiction. SEITA has failed to do this, demonstrating only that the Tampa office "helped to make the gun whence the bullet was fired from places abroad," *Bersch*, 519 F.2d at 987, or engaged in "mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries," *IIT*, 519 F.2d at 1018. This is not enough.

SEITA cites *Venture Fund (Int'l) N.V. v. Willkie Farr & Gallagher*, 418 F.Supp. 550, 555–56 (S.D.N.Y.1976), for the proposition that when parties provide divergent accounts of facts relevant to jurisdiction, as they have in this case, the appropriate course is to allow discovery to proceed, rather than having the case decided on a motion to dismiss. Yet here, unlike in *Venture Fund*, the Com-

plaint itself defeats a finding of subject matter jurisdiction, and the divergent accounts of facts presented by the parties need not, therefore, be considered or more fully developed by discovery.

### Conclusion

For the reasons set forth above, the motion to dismiss for lack of subject matter jurisdiction will be granted and the case closed.

It is so ordered.