Thomas **ROHRER,** Walter Ritter, Ralf Schenek, Gabriele Lichlederer–Wenniger, Mohaupt Reinhard, Karin Knoll, Lothar Heinzle, Alfred Muth and Susanne Roth, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**FSI FUTURES, INC.,** Techno Trading Systems Company, Michael Hjalmar Thomas, individually and d/b/a Hosse USA Inc. and Lit America, Inc., Defendants.

No. 94 Civ. 6345(CSH).

United States District Court, S.D. New York.

Oct. 20, 1997.

---

272

Roger J. Bernstein, New York City, for Plaintiffs.

Christopher Lovell, Lovell & Skirnick, LLP, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

In this action brought by citizens and residents of Germany under the anti-fraud provisions of the Commodities Exchange Act, 7 U.S.C. § 1 *et seq* ("CEA"), which also asserts common law legal and equitable claims, defendants move to dismiss the complaint pursuant to Rule 12(b)(3), Fed.R.Civ.P., for improper venue; or, in the alternative, pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction; or, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### Background

Much of the procedural history of this litigation is recited in the Court's Memorandum Opinion and Order dated May 1, 1996 ("the May 1996 Opinion"), familiarity with which is assumed. The May 1996 Opinion granted in part and denied in part plaintiffs' motion to file and serve a third amended complaint. Thereafter plaintiffs filed and served a third amended complaint consistent with the May 1996 Opinion. Defendants' motion to dismiss addresses that pleading, which for the sake of brevity I will refer to as "the complaint."

The facts set forth below are drawn from the complaint and do not represent findings of fact by the Court.

The nine plaintiffs are citizens and residents of Germany, who invested and held accounts in a commodity investment program offered and sold by the defendants and their agents, known as the "HOSSE Program." Compl. ¶ 1.[1]

Defendant FSI Futures, Inc. ("FSI") is a New York corporation, registered under the CEA as a future commission merchant ("FCM"). Because FSI is not a "clearing member" of any futures clearing house, it must utilize an FCM which is a clearing member of the various American futures contract markets. At the relevant times, FSI utilized defendant LIT America, Inc. ("LIT") as its clearing broker for commodities transactions in the United States. Compl. ¶ 2.

Defendant Techno Trading Systems Company ("Techno Trading") is a Pennsylvania corporation, registered under the CEA as an introducing broker ("IB"). The CEA defines an IB as a person or entity engaged in soliciting or in accepting orders for the purchase or sale of any commodity for futures delivery on or subject to the rules of any contract market. Under the CEA, an IB may not accept any money, securities, or property to margin, guarantee, or secure any trades or contracts. Compl. ¶ 3.

Defendant Michael Hjalmar Thomas is a citizen of Senegal who held a "green card" to work in the United States at the relevant times, was the principal of Techno Trading, and also operated an entity known as "Hosse USA." Compl. ¶ 4.

Defendant LIT was registered under the CEA as an FCM until August 17, 1993, and maintained offices in New York City and Chicago. Compl. ¶ 5.[2]

Defendants and their agents operated the HOSSE Program from about May 1988 until May 1993, through oral and written sales solicitations. During this period, approximately 1,570 German citizens and residents invested approximately 70,000,000 Deutsche Marks ($45,000,000 U.S.) in the Program. These investors were unsophisticated in financial matters generally, and inexperienced in commodity trading in particular. Plaintiffs and the other investors were solicited though high pressure "boiler room" sales agents representing a firm called H.O.S.S.E. GmbH and two sister firms, Tunc & Partner and Rosco GmbH of Germany, all located in or near the city of Essen, Germany. Throughout their complaint, plaintiffs refer to these three sales operations collectively as "HOSSE." All three firms were owned and controlled by one Jurgen Schoeps, who is now incarcerated in Germany.[3] The Essen police authorities have closed the HOSSE offices and suspended their operations. Compl. ¶¶ 10–12.

The seed of defendants' fraudulent scheme was planted when in December 1988, Thomas travelled to Germany to meet with one Marcus Hosse. They decided to embark upon a joint venture to sell commodity investments to German citizens. The joint venturers were the HOSSE companies, Techno Trading, FSI, and LIT. The role of Techno Trading, an IB, was to act as a *de facto* FCM. FSI and LIT carried the HOSSE Program accounts as FCMs. Compl. ¶ 13.

German investors were sold the HOSSE Program through brochures and prospectuses which included the defendants' names. These documents falsely promised or stated that investors would be contacted about potentially profitable market situations before any orders were placed; that the HOSSE Program was a profitable method with low risk for the purpose of buying and selling commodity futures contracts and options on United States futures exchanges; that HOSSE trading personnel were experienced specialists who, in contrast to other trading houses, could minimize their clients' investment risks; that losses could be avoided through the use of trading stop orders; that the HOSSE Program utilized "renowned"

**1.** Plaintiffs purport to sue individually and on behalf of all others similarly situated, which is to say, German investors in the Hosse Program. The question of class certification will be dealt with in a separate opinion.

**2.** Prior to the filing of this motion, plaintiffs settled their claims against LIT. The motion is made on behalf of the remaining defendants.

**3.** Although the complaint does not state this specifically, I assume that Jurgen Schoeps is also a citizen and resident of Germany.

274

U.S. brokerage houses such as Techno Trading Systems and Hosse USA; that in the commodity markets, one can purchase futures without paying for them; and that risks would be minimized by the employment of proven risk minimizing strategies. Compl. ¶¶ 14–16, 20.

These offering materials failed to disclose to investors the material facts that substantial cash kickbacks were deducted from the investors' monies and rebated to the German sales agents; that contrary to assurances given to investors that they were buying individual positions in commodity futures contracts on the various exchanges, the individual investments would be pooled in an omnibus, commingled account under the defendants' control, and that the defendants intended to, and did, place and liquidate trades without any prior contact with plaintiff investors, on a wholesale basis where all investors were treated as part of one commingled entity, so that no investor could be assured that the investment results reported to him could fairly be allocated to his investment instructions; that despite assurances to that effect, Techno Trading and Hosse USA, far from being "renowned" brokerage houses, were in fact not even brokerage houses; that the extraordinarily high ratio of brokerage commissions and management fees to the amount of funds invested made any return to investors very unlikely; the true amount of risk involved in the HOSSE Program; that commodity transactions and option trades, referred to interchangeably in the prospectuses, involved very different elements of risk; and the rate of commissions that would be charged on commodity transactions. Compl. ¶¶ 17–20.

Funds invested by German investors in the HOSSE Program were transferred from HOSSE accounts at the Frankfurt branch of the Royal Bank of Scotland to accounts in the name of HOSSE or its principals at Citibank in New York, and from there to brokerage accounts at FSI and LIT. Defendants also established separate accounts for the specific purpose of paying rebates to their German agents. The defendants carried out trading in the HOSSE Program for the purpose of generating excessive commissions on trades, without regard for their profitability. LIT and FSI deducted those commissions and paid them to Techno Trading or Thomas, or funnelled such payments directly in the form of large cash kickbacks, undisclosed to investors, to relatives and agents of the German sales force. Specifically, a Mrs. Van Leeuwen, the sister of Jorg Schoeps, a HOSSE principal, and Ralph Fasstner, Jorg Schoep's brother-in-law, flew every several weeks from Germany to New York, proceeded to Techno Trading's offices in Zionsville, Pennsylvania to pick up suitcases containing between U.S. $100,000 and $300,000, and carried the suitcases back to Germany, where the currency was converted into Deutsche Marks. Plaintiff investors were never told about this method of transporting "commissions" from the United States to Germany in the form of cash-filled suitcases; or that the excessive amounts of those cash "commissions" meant that a reasonable return on their investment would be unlikely, if not impossible. Compl. ¶¶ 21–22, 25–28.

In violation of the CEA and regulations promulgated thereunder, Techno Trading, directly and through its *alter ego* Hosse USA, and with the knowledge of FSI, mailed or telefaxed monthly account statements to individual investors, either through HOSSE sales agents or to the investors directly, which falsely purported to be from an FCM, and falsely represented the true status of their accounts to investors, in order to conceal the fact that funds received from investors were being commingled and traded as one account, a deception the defendants furthered by sending investors false confirmation statements that they had individual interests in contracts traded on United States markets. Compl. ¶¶ 23, 24, 30.

FSI, Thomas and Techno Trading had discretionary trading authority over the HOSSE Program accounts. They employed trading strategies devised to facilitate the consumption of investors' equity and the generation of brokerage commissions disproportionate to the amounts traded. Those trading strategies included a high degree of trading in and out of markets frequently ("day trading"), in order to earn brokerage

commissions as rapidly as possible. Furthermore, most of the money raised from investors went to the payment of excessive and undisclosed commissions and kickbacks to German selling agents and promoters, rather than the actual trading of commodity futures contracts. Compl. ¶¶ 31, 32.

The trading authority exercised by FSI, LIT, Thomas and Techno Trading, as well as trading strategies suggested by FSI and employed in controlling the trading of the HOSSE Program, placed these defendants under fiduciary obligations to the plaintiffs to trade their accounts in a reasonable and prudent manner. Defendants breached those obligations by defrauding plaintiffs. Compl. ¶¶ 34, 36.

Limited common funds consisting of HOSSE Program credit account balances remain in the custody and control of FSI and LIT, which FSI and LIT maintain in the United States, and which are subject to competing claims. FSI and LIT have refused to turn over these funds, despite requests to do so from plaintiffs and German authorities. Compl. ¶ 37.

The complaint asserts six counts: Count I, common law fraud in the inducement; Count II, common law conversion; Count III, violation of the anti-fraud provisions of the CEA; Count IV, a demand for an equitable accounting; Count V, a common law claim for money had and received; and Count VI, an equitable claim for the imposition of a constructive trust.

Defendants now move to dismiss this complaint.

## Discussion

### VenSue

■ Defendants move to dismiss the complaint on the ground of improper venue. That motion is based on a provision in the German language form contracts executed by investors in the HOSSE Program which provided (in translation) that "[t]he venue for settlement of all obligations and the exclusive jurisdiction for disputes arising from the business transactions between H.O.S.S.E. GmbH and the Investor shall be Essen."

The parties dispute the effect of this contractual provision, and whether the defendants at bar are in a position to invoke it. But I need not reach these questions because it is clear that, in any event, defendants have waived the right to object to the venue.

Rule 12 (h)(1) provides in pertinent part that "[a] defense of improper venue ... is waived (A) if omitted from a motion [made in lieu of a responsive pleading]. in the circumstances described in subdivision (g) [which requires consolidation of most defenses in a single motion]."

■ "The purpose of Rule 12 is to eliminate unnecessary delays in the early pleading stages of a suit so that all available Rule 12 defenses are advanced before consideration of the merits." *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industries Fund*, 967 F.2d 688, 691 (1st Cir.1992). "[T]he message conveyed by the present version of Rule 12(h)(1) is quite clear. It advises a litigant to exercise great care in challenging personal jurisdiction, venue, or service of process. If he wishes to raise any of these defenses he must do so at the time he makes his first significant defensive move—whether it be by way of a Rule 12 motion or a responsive pleading." 5A Wright & Miller, *Federal Practice and Procedure* (2d ed.1990) at § 1391, p. 752 (footnote omitted). If an objection to the venue could have been made in response to the original complaint, the defense is waived, and may not be interposed against an amended complaint. *See Gilmore v. Shearson American Express, Inc.*, 811 F.2d 108, 112 (2d Cir.1987) ("district courts in this circuit have determined that the Rule 12 defenses of lack of personal jurisdiction, improper venue, insufficiency of process and insufficiency of service, if waived by defendant's failure to raise those objections in response to the original complaint, may not be resurrected merely because a plaintiff has amended the complaint") (citing cases). *Gilmore* arose in the context of waiver of an arbitration clause, but the Second Circuit regarded the district court decisions on Rule 12 practice as useful analogies. ("As with the objections listed above, a motion to compel arbitration of a claim involves the core issue of a party's

willingness to submit a dispute to judicial resolution and, if waived, is not automatically revived by the submission of an amended complaint." *Id.*).

These authorities apply to the case at bar, since on February 21, 1995, these defendants moved to dismiss plaintiffs' first amended complaint without raising the defense of improper venue, although the factual basis said to support that defense existed then, as it exists now. Accordingly defendants have waived the defense of improper venue.

*Subject Matter Jurisdiction*

The question of Federal subject matter jurisdiction *vel non* is not one that a defendant can waive. On the contrary: all parties may agree among themselves that the district court has subject matter jurisdiction, but the courts, trial and appellate, are obligated to consider the matter *sua sponte*. For that reason I will do so in this case, although defendants do not treat the subject in their reply brief and may have abandoned it.

A motion to dismiss an action for lack of subject matter jurisdiction falls under Rule 12(b)(1). On a Rule 12(b)(1) motion, the Court need not accept as true contested jurisdictional allegations, and may resolve disputed jurisdictional facts by reference to affidavits and other matters outside the pleadings. The burden of proving subject matter jurisdiction is on the party asserting it. *See Societe Nationale D'Exploitation Industrielle v. Salomon Brothers International Ltd.*, 928 F.Supp. 398, 402 (S.D.N.Y.1996) (Sweet, *J.*).

In the case at bar, plaintiffs' third count charges defendants with violating section 4b of the CEA, 7 U.S.C. § 6b. The broad anti-fraud provisions of § 6b(a) are set out in part in the margin.[4] Plaintiffs also rely upon section 2(a)(1)(A)(iii) of the CEA, 7 U.S.C. § 4, which provides that for purposes of the statutory scheme, "the act, omission, or failure of any . . . agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment . . . shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such . . . agent, or other person."

Defendants at bar argue that "[w]hen Germans solicit other Germans in Germany for an investment program by means of fraud in the inducement through an allegedly false Brochure which is delivered and causes losses in Germany," there is no subject matter jurisdiction under the CEA. Main Brief at 17. I do not think that is a complete characterization of plaintiffs' complaint. But it is useful first to review the governing law.

Federal commodities and securities laws, regarded as analogous on the point, are silent regarding the issue of extraterritorial jurisdiction over cases of alleged fraud. But Second Circuit cases delineate the boundaries. When faced with transactions that are "predominantly foreign," courts must ask "whether Congress would have wished the

4. § 6b Fraud, false reporting, or deception prohibited (a) Contracts designed to defraud or mislead; bucketing orders

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person in such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof—

(i) to cheat or defraud or attempt to cheat or defraud such other person;

(ii) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contrast or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person . . .

precious resources of the United States courts" to be devoted to such transactions. *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.), (Friendly, *J.*).

Courts in this Circuit employ two tests to determine whether subject matter jurisdiction exists: the "conduct test" and the "effect test." *See, e.g., Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121–22 (2d Cir.1995) (citing cases) (arising under Securities Exchange Act of 1934), *cert. denied,* —— U.S. ——, 116 S.Ct. 703, —— L.Ed.2d —— (1996).

 Under the conduct test, "a federal court has subject matter jurisdiction if the defendant's conduct in the United States was more than merely preparatory to the fraud, and particular acts or culpable failures to act within the United States directly caused losses to foreign investors." Under the effect test, a federal court has jurisdiction "where illegal activity abroad causes a substantial effect within the United States." *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.1991 (citations and internal quotation marks omitted).

Plaintiffs at bar contend that the defendants' alleged acts satisfy both jurisdictional tests. I think plaintiffs' invocation of the effect test is problematical; but the complaint's allegations, with which jurisdictional analysis begins, describe a pattern of behavior by defendants which clearly meets the conduct test.

 It is of no moment that the solicitation and purchase of interests in the HOSSE Program took place in Germany. *See Itoba Ltd.,* 54 F.3d at 123 ("The fact that the Lep ordinary shares were issued and purchased in England does not change our conclusion. The conduct test does not center its inquiry on whether domestic investors or markets are affected, but on the nature of

conduct within the United States as it relates to carrying out the alleged fraudulent scheme.") (citations and internal quotation marks omitted). Activities in the United States are not sufficient to sustain Federal jurisdiction if they can fairly be characterized as "merely preparatory," "relatively small in comparison to those abroad," "far removed from the consummation of the fraud," or are "secondary," "ancillary," or "tertiary." *Societe Nationale,* 928 F.Supp. at 403 (citations omitted). But Federal subject matter jurisdiction exists "where conduct material to the completion of the fraud occurred in the United States." *Psimenos v. E.F. Hutton & Co., Inc.,* 722 F.2d 1041, 1043 (2d Cir.1983).

Application of the appropriate label depends upon the particular circumstances of the case. In the case at bar, plaintiffs allege *inter alia* that the cash, stuffed into suitcases in the United States for delivery in Germany to co-conspirators or beneficiaries of a fraudulent scheme, was generated by fraudulent trading in United States commodities markets, a fraud sought to be concealed by the mailing of misleading account statements from the United States to individual investors in Germany. It requires no analysis to demonstrate that this conduct in the United States was material to the completion of the alleged fraud.[5] The closest case on the facts is the Second Circuit's decision in *Psimenos,* where the plaintiff alleged violation of the anti-fraud provisions of the CEA. While the fraudulent inducement leading to the Greek plaintiff's losses occurred in Greece and Switzerland, *see* 722 F.2d at 1043–44, the court of appeals, sustaining Federal jurisdiction under the conduct test, observed that "[t]he trades Hutton executed on American markets constituted the final act in Hutton's alleged fraud on Psimenos, without which

---

**5.** No comparable circumstances are revealed by Judge Sweet's decision in *Societe Nationale,* upon which defendants place primary reliance Plaintiff there alleged that through acts occurring in France and England, it was fraudulently induced to invest in financial products known as "Swaps Transactions." The Swaps themselves, which "are not alleged to have been fraudulent," 928 F.Supp. at 404, were marketed by the principal defendant to plaintiff "from London," *id.* at 403. The defendants made no use of American trading markets, commodities or otherwise, in

order to further or consummate the scheme. In these particular circumstances, Judge Sweet concluded that "[t]he gravamen of the purported federal claims asserted by [plaintiff] can only be read as fraud in the inducement," *id.* at 404, an inducement which occurred only in Europe, and with the fraud being consummated by the execution of investment agreements in Europe. Not surprisingly, Judge Sweet found no basis for Federal jurisdiction. That case bears no meaningful resemblance to the case at bar.

Hutton's employees could not have generated commissions for themselves." *Id.* at 1044. In the court's view, when evaluating jurisdiction under the conduct test, "[f]ar weightier is the fact that Hutton's agents completed the alleged fraud by trading domestic futures contracts on American commodities exchanges." *Id.* at 1046. The Second Circuit reasoned in *Psimenos* that Congress did not "want United States commodities markets to be used as a base to consummate schemes concocted abroad, particularly when the perpetrators are agents of American corporations." [6]

There is no principled basis for distinguishing the plaintiff's allegations in *Psimenos* from those of the instant plaintiffs. That case, and the others referred to, mandate the conclusion that under the conduct test, this Court has subject matter jurisdiction over plaintiffs' claims.

*Rule 12(b) (6) Motion*

■ "It reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in plaintiff's favor. The complaint may be dismissed only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is unlikely but that is not the test." *Gant v. Wallingford Board of Education,* 69 F.3d 669, 673 (2d Cir.1995) (citations and internal quotation marks omitted).

This Court's May 1, 1996 opinion, allowing the filing and service of the amended complaint at issue pursuant to Rule 15(a), reject-

ed defendants' contentions that the complaint's fraud allegations were insufficient under Rule 9(b), and its agency allegations were futile. In Rule 15(a) practice, it is frequently held that "if a complaint as amended could not withstand a motion to dismiss, then the amendment should be denied as futile." 6 Wright–Miller–Kane, *Federal Practice and Procedure* (2d ed.1990) at § 1487, p. 643 (footnote omitted). The opinion allowing the amendment held by necessary implication that the proposed complaint could withstand a motion to dismiss, and to that extent constitutes the law of the case.

■ On the present motion, defendants continue to challenge the sufficiency of plaintiffs' allegations, but the complaint easily satisfies the undemanding criteria of Rule 12(b)(6). No extended discussion is necessary. But the lack of substance of defendants' motion may be illustrated by their insistence that the HOSSE Program brochures referred at various places to the subject of risk.[7] This is said to negate the complaints' allegations that the brochure's fraudulently minimized the risk. Even if the texts of the brochures had that effect, at least to some degree, they did not advise potential investors that the defendants and their associates planned to commingle all individual investments in a common pool and then trade in commodities markets for the purpose of generating large amounts of cash that would be distributed to the schemers, at the expense of investors.

The allegations of the complaint were reviewed at length at pp. 272–275, *supra.* It is quite impossible to conclude, as defendants ask me to do, that it appears beyond doubt that plaintiffs can prove no set of facts on

---

6. The Seventh Circuit reached the same conclusion in similar circumstances in *Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103, 1106 (7th Cir.1984) (" [W]e find no indication, however, that Congress intended to prohibit fraudulent dealings connected with futures trading on domestic exchanges only if the futures transactions originate in the United States."). Indeed, the court of appeals in *Tamari* affirmed the holding of the district court that jurisdiction existed under·both the conduct and the effect tests. *Id.* at 1108.

7. On this motion to dismiss I may consider the text of the brochures, although not attached to the complaint, because plaintiffs allege that the brochures contained misrepresentations or omissions. The brochures are accordingly incorporated by reference in the complaint, and defendants may supply the text on a Rule 12(b)(6) motion. *See I. Meyer Pincus and Associates, P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991).

any of their claims which would entitle them to any relief.

For the foregoing reasons, defendants' motion to dismiss the third amended complaint is denied in its entirety.

The Court lifts the stay on discovery. The parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:30 p.m. on November 21, 1997.

It is SO ORDERED.