**INTERBREW S.A., Plaintiff,**

v.

**EDPERBRASCAN CORPORATION, Defendant.**

**No. 98 Civ. 3547 (SAS).**

United States District Court, S.D. New York.

Oct. 20, 1998.

David B. Tulchin, Jay Holtmeier, Sullivan & Cromwell, New York City, for Plaintiff.

Robert A. Alessi, Serina M. Vash, Cahill Gordon & Reindel, New York City, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Interbrew S.A. ("Interbrew") brings this action for violations of § 10(b) of

the 1934 Securities Exchange Act and Rule 10b–5 promulgated thereunder. Plaintiff also asserts pendant state law claims for common law fraud and negligent misrepresentation. Subject matter jurisdiction is premised upon a federal question, 28 U.S.C. § 1331, and principles of supplemental jurisdiction, 28 U.S.C. § 1367(a).

Interbrew seeks damages resulting from allegedly fraudulent misrepresentations by EdperBrascan's corporate predecessor, Brascan Limited ("Brascan"), regarding its obligation to purchase for cash, or its equivalent, certain securities held by John Labatt Limited ("Labatt"). Interbrew alleges that these misrepresentations, upon which it relied to its detriment, caused it to purchase and hold Labatt shares at an artificially inflated price.

Defendant EdperBrascan moves to dismiss the Complaint pursuant to Fed.R.Civ.P. 9(b), 12(b)(1), 12(b)(2) and 12(b)(6), claiming that the Complaint fails to state a claim upon which relief can be granted, fails to plead fraud with particularity, and that this Court lacks subject matter jurisdiction over the case and personal jurisdiction over the Defendant. In the alternative, Defendant seeks to stay or dismiss this action in deference to related litigation pending in Canada or to dismiss the action on the ground of *forum non conveniens.*

## I. Standards Under Rule 12(b)

Before a court can consider a *forum non conveniens* motion, it must first determine whether it has jurisdiction over the case and the parties. *See Monsanto International Sales Co., Inc. v. Hanjin Container Lines, Ltd.,* 88 Civ. 1673, 1991 WL 210951, at *1 (S.D.N.Y. Oct.8, 1991); *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

Defendant urges that because it made a "facial" challenge to subject matter jurisdiction pursuant to Rule 12(b)(1)—contesting only "the sufficiency of the jurisdictional facts alleged, not the facts themselves," *Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d 874, 887 n. 15 (2d Cir.1996)—the Court should not look beyond the Complaint to consider the affidavits submitted by Plaintiff. *See Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990). The rule in this circuit does not appear to be so firm. *See,*

*e.g., Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 108 (2d Cir.1997) ("Even if Ace challenges only the sufficiency of Transatlantic's complaint, we are entitled at any time sua sponte to delve into the issue of whether there is a factual basis to support the District Court's exercise of subject matter jurisdiction... In so doing, the case law does not limit our right to refer to any material in the record" (citations omitted)). Nevertheless, because Defendant has made a facial attack against this Complaint, and the Court is considering the attack in that manner, Plaintiff "is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the Court must consider the allegations of the complaint to be true." *U.S. v. Suffolk Construction Co., Inc.,* 95 Civ. 9363, 1996 WL 391875, at *1 (S.D.N.Y. July 12, 1996) (*quoting Williamson v. Tucker,* 645 F.2d 404, 412 (5th Cir.1981)).

## II. Background

Defendant EdperBrascan is a corporation organized under the laws of Ontario, Canada, formed through the combination of Brascan and The Edper Group Limited on or about August 1, 1997. Its voting shares are traded on the American Stock Exchange, the Toronto Stock Exchange and elsewhere.

Plaintiff Interbrew is a société anonyme organized under the laws of Belgium, with its headquarters in Brussels, Belgium. Interbrew makes and sells beer and other products. Through a wholly owned subsidiary, Interbrew owns 100% of the shares of Labatt Brewing Company Ltd. (a corporate successor to Labatt, a corporation organized under the laws of Canada). In addition, Interbrew indirectly owns 78% of the shares of Labatt USA L.L.C., based in Norwalk, Connecticut, and 78% of the shares of Latrobe Brewing Company L.L.C., based in Latrobe, Pennsylvania.

From approximately 1980 until March 8, 1993, Brascan owned roughly 38% of the outstanding common shares of Labatt, with the remainder owned by public shareholders. Due to this substantial investment and the presence of various Brascan directors and officers on the Labatt Board of Directors,

Brascan exercised effective control of Labatt during this time. *See* Complaint ("Cmplt.") at ¶ 12.

During the years of Brascan's control of Labatt, Brascan caused Labatt to make investments of approximately (Cdn) $300 million in Epsim Investments Limited ("Epsim") and Mico Investments Ltd. ("Mico"), other entities also controlled by Brascan. *See* Cmplt. at ¶¶ 3, 13, 14. The securities of these companies were not traded on any established market nor were they freely resalable. Thus, Labatt's investments in these companies would be virtually worthless to Labatt without some mechanism by which it could convert these investments into cash or freely-traded, marketable securities. *See id.*

In February 1993, Brascan announced its intention to sell its 38% stake in Labatt. In connection with that sale, Brascan officials represented to the Labatt Board of Directors that Labatt's investments in Epsim and Mico would be liquidated at book value and that, if any of the investments remained unsold at the end of five years (i.e. by the end of March, 1998), Brascan would purchase them for cash or market-traded securities which could be quickly converted into cash. *See* Cmplt. at ¶¶ 3, 15. Brascan repeated the substance of these representations in its prospectus, through which it registered its shares of Labatt and sold them to the public on March 8, 1993. *See* Cmplt. at ¶ 16.

These representation took other forms as well. On March 9, 1993, the day after Brascan's shares had been sold, Brascan confirmed its commitment to monetize the investments by signing an agreement with Labatt ("the Agreement") which would facilitate the monetization of the Epsim and Mico investments at book value. *See* Cmplt. at ¶¶ 17, 18. Subsequently, on March 11, 1993, Labatt's Board of Directors, including those members who were also Brascan Directors, unanimously approved Labatt's financial statements, which classified the Epsim and Mico investments as long-term assets at their full book value. *See* Cmplt. at ¶¶ 4, 19. On August 10, 1993, Labatt filed its Annual Report for the fiscal year ending April 30, 1993, containing the financial statements based in turn on the Agreement signed with Brascan, with the U.S. Securities and Exchange Commission (the "SEC"). *See* Cmplt. at ¶ 20. This classification also appeared in Labatt's Annual Report for the fiscal year ending April 30, 1994, filed with the SEC on August 16, 1994 (the "1994 Annual Report").

Relying on these and other representations concerning the value of Labatt's investments (and thus the value of Labatt), Interbrew's financial advisors determined the price they were willing to pay for Labatt common shares. *See* Cmplt. at ¶ 25. Ultimately, on July 26, 1995, pursuant to a tender offer dated June 14, 1995, Interbrew purchased all of the outstanding common shares of Labatt at a price of (Cdn) $28.50 per share, for a total price of approximately (Cdn) $2.7 billion. *See* Cmplt. at ¶¶ 24, 26. Of this price, the value of Labatt's investment in Epsim and Mico, with a full book value then of about (Cdn) $158 million, accounted for approximately (Cdn) $1.70 per share.

By March 31, 1998, Labatt's investments in Epsim and Mico had a book value of approximately (Cdn) $135.5 million. *See* Cmplt. at ¶ 28. Interbrew alleges that EdperBrascan now offers to monetize this investment by providing shares in another entity that Labatt Brewing (Labatt's successor) cannot convert to cash for an equivalent amount, significantly devaluing the worth of the initial investments. *See* Cmplt. at ¶¶ 29, 31. Thus, Interbrew alleges that it effectively purchased and held Labatt shares at an artificially inflated price. *See* Cmplt. at ¶ 1.

## III. Subject Matter Jurisdiction

### A. Standard for Determining Jurisdiction

The Securities Exchange Act is silent as to its extraterritorial application, as has long been recognized. *See Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121 (2d Cir.1995); *Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir. 1991). As Judge Friendly observed: "When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign

countries." *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (2d Cir.1975).

To guide courts in this effort, two jurisdictional tests have emerged: the "conduct test", as announced in *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1336–37 (2d Cir.1972), and the "effects test", as announced in *Schoenbaum v. Firstbrook,* 405 F.2d 200, 206–9 (2d Cir.), *rev'd with respect to holding on merits,* 405 F.2d 215 (2d Cir.1968) (en banc).

■ Under the conduct test, a federal court has subject matter jurisdiction if (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere, *Bersch,* 519 F.2d at 987, and (2) these activities or culpable failures to act within the United States "directly caused" the claimed losses, *Alfadda,* 935 F.2d at 478. The fact that both the plaintiff and defendant are foreign corporations is not dispositive. "The conduct test does not center its inquiry on whether domestic investors or markets are affected, but on the nature of conduct within the United States as it relates to carrying out the alleged fraudulent scheme. . . ." *Itoba,* 54 F.3d at 123 (*quoting Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1045 (2d Cir.1983)). Inherent in the conduct test is the principle that Congress does not want " 'the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.' " *Psimenos,* 722 F.2d at 1045 (*quoting IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1017 (2d Cir.1975)).

■ Under the "effects" test, a federal court has subject matter jurisdiction if the defendant's conduct abroad has "substantial" impact in the United States. *See Alfadda,* 935 F.2d at 478. If the conduct impacts on "stock registered and listed on [an American] national securities exchange and [is] detrimental to the interests of American investors," *Itoba,* 54 F.3d at 124 (*quoting Schoenbaum,* 405 F.2d at 208), that is considered to be a "substantial" impact in the United States.

The Second Circuit has noted that these tests need not be considered separately, but that "an admixture or combination of the two often gives a better picture of whether there

is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Itoba,* 54 F.3d at 122.

In a case this Court finds highly instructive, if not controlling, the Second Circuit recently addressed the extraterritorial application of the anti-fraud provisions of U.S. securities laws with regard to primarily foreign actors and events. In *Europe and Overseas Commodity Traders v. Banque Paribas London,* 147 F.3d 118 (2d Cir.1998), despite applying a combination of the "conduct" test and the "effects" test, and despite acknowledging that at least some critical events occurred in the United States, the court found that it had no subject matter jurisdiction. That misrepresentation and reliance may occur on U.S. soil and still fail to implicate federal jurisdiction emphasizes that a simple mechanical application of the jurisdictional tests is insufficient. A proper analysis should focus on the policy considerations that led to the extraterritorial application of these laws in the first place—protecting or punishing U.S.-parties and markets. "Congress may not be presumed to have prescribed rules governing activity with strong connections to another country." *Europe and Overseas,* 147 F.3d at 131.

## B. Application of the Standards to the Instant Dispute

### 1. The Effects Test

■ According to the Complaint, "[a]s a result of Brascan's fraudulent misrepresentations, Labatt common shares traded in 1995 at an artificially inflated price, causing Interbrew to suffer damages when it purchased and held shares at the artificially inflated price." *See* Cmplt. at ¶ 7. The "effects" test directs attention to the impact of overseas activity on U.S. investors and securities traded on U.S. securities exchanges. Considered from this vantage, the alleged effects on U.S. interests are minimal: Plaintiff is a Belgian organization suing a Canadian defendant for alleged losses sustained in connection with the purchase of a Canadian corporation, whose stock is traded on a Canadian stock exchange. Interbrew alleges no effect on a U.S. affiliated company.

While Interbrew does draw attention to U.S. investors who participated in this transaction as owners of the approximately 25% of Labatt's shares tendered by U.S. investors (about 387 U.S. residents in about 40 states and the District of Columbia, *see* Cmplt. at ¶ 24), these investors were neither the intended nor the actual "victims" of Brascan's purported scheme to defraud. The only justification for considering their participation as a basis for the exercise of jurisdiction would be to use the securities laws to "insure the maintenance of fair and honest markets" as Interbrew urges. The anti-fraud provisions of the U.S. securities laws would then be used to address general market conditions rather than redress specific harms suffered by some U.S.-interested party, a goal specifically foreclosed by numerous interpretations of the securities laws. *See, e.g., Koal Industries Corp. v. Asland, S.A.,* 808 F.Supp. 1143, 1155 (S.D.N.Y.1992) (subject matter jurisdiction over fraudulent acts, relating to securities, which are committed abroad exists "only when these result in injury to purchasers or sellers of those securities in whom the United States has an interest, not where acts simply have an adverse affect on the American economy or American investors generally" (*quoting Bersch,* 519 F.2d at 989)); *Itoba,* 54 F.3d at 124.

To the extent that Brascan's allegedly misleading statements caused specific harmful effects, those effects were felt by Interbrew, a Belgian organization, and its investors (none of whom are alleged to be Americans). Thus, "there is ... no U.S. entity that Congress could have wished to protect from the machination of swindlers." *Europe and Overseas,* 147 F.3d at 128. Here, as in *Europe and Overseas,* the parties, events, and harm (if any) due to the alleged fraud are overwhelmingly foreign. Thus, the Complaint fails to establish that this Court has subject matter jurisdiction under the effects test.

## 2. The Conduct Test

■ Turning to the conduct test, it is the defendant's activities in the United States that are relevant: Interbrew must establish that Brascan's U.S.-based activities were more than "merely preparatory" to a securities fraud conducted elsewhere, *Bersch,* 519 F.2d at 987, and "directly caused" Interbrew's financial losses. *Alfadda,* 935 F.2d at 478.

Interbrew alleges that from 1993 through 1997, Brascan repeatedly made material misrepresentations concerning its obligations to fully monetize Labatt's investments in Epsim and Mico: in meetings with Interbrew officers, *see* Cmplt. at ¶¶ 2, 5, 21, 22, 27, 34, in Brascan's publicly-filed documents, *see* Cmplt. at ¶¶ 2, 4, 6, 16, 21, 26, 34, to "the market," *see* Cmplt. at ¶¶ 21, 22, 35, and in meetings with Labatt's Directors and outside auditors, *see* Cmplt. at ¶¶ 2, 4, 15, 17, 19, 22, 34, which resulted in significant overstatements of assets in Labatt's financial statements, filed with the SEC as part of its Annual Reports. *See* Cmplt. at ¶¶ 2, 4, 20, 34.

These misrepresentations fall into two categories: (1) those made prior to and relied on in connection with Interbrew's purchase of Labatt's shares and (2) those made after Interbrew's purchase of Labatt was complete, in which Interbrew alleges that Brascan continued perpetrating the fraud in further conversations and in public filings. *See, e.g.,* Cmplt. at ¶¶ 6 and 26, where Interbrew alleges that following its purchase of Labatt shares, Brascan continued to state in documents filed publicly in the U.S. that it was obligated to monetize the Labatt investments at book value by the end of March 1998, and Interbrew continued to hold its shares of Labatt.

Interbrew alleges that had it known that Brascan never intended to fully monetize Labatt's investments in Epsim and Mico it would not have been willing to purchase Labatt's shares at the same price. *See* Cmplt. at ¶ 25. Interbrew does not allege, however, that given similar knowledge it would not have been willing to *maintain* its investment in Labatt. *See, e.g.,* Cmplt. at ¶¶ 25, 36, 37. For purposes of this motion, this failure moots Interbrew's reliance on its additional allegations that Brascan continued to perpetrate the fraud in further filings with the SEC after Interbrew completed its purchase of Labatt.

Nor would this defect likely be cured by an amended Complaint. Title 15 U.S.C. § 78j,

under which Plaintiff brings this action, relates to fraud "in connection with the purchase or sale of any security..."[1] While the inclusion of the "in connection with" language limits the fraud-related provisions to securities-related fraud rather than to fraud committed generally, courts have interpreted the phrase to require, as a threshold matter, that the fraud actually have affected a purchase or sales transaction, not the mere retention of a security. *See Manela v. Gottleib,* 91 Civ. 5510, 1993 WL 8176, *4 (S.D.N.Y. Jan.4, 1993) ("It is settled law that plaintiffs must allege that the fraud complained of was committed prior to or contemporaneous with the transaction." (*citing S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860 (2d Cir.1968); *Zaro v. Mason,* 658 F.Supp. 222, 226 (S.D.N.Y.1987))). *See also, Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1227 (S.D.N.Y.1982) ("'Mere retention' of securities during a period of an alleged violation does not satisfy the requirement that the violation be in connection with the purchase or sale of a security.").

Therefore, I am only considering those alleged misrepresentations made prior to the close of the Offer to Purchase, which occurred on July 26, 1995,[2] and excluding from consideration those alleged misrepresentations occurring after that date.

■ In developing its Offer to Purchase in 1995, Interbrew alleges that its financial advisors placed special reliance on Brascan's oral representations at a June 29, 1995 meeting, Brascan's written representations in its publicly-filed Annual Information Form for the year ending December 31, 1994 filed on May 19, 1995 (the "1995 Information Form"), and on statements made in Labatt's financial statements filed with the SEC as part of its 1994 Annual Report. *See* Cmplt. at ¶¶ 21, 25.

Nowhere does Interbrew allege that any face-to-face meetings—either with Labatt officers and auditors or with Interbrew officers—occurred in the United States. It is not alleged that the oral representations made by Brascan at the June 29, 1995 meeting took place in the United States. Nor does Interbrew allege that the 1995 Information Form was filed in the United States. Similarly, Interbrew's allegations concerning alleged misrepresentations made by Brascan to "the market" refer to the Toronto Stock Exchange where Labatt shares traded "[p]rior to and at the time of the tender offer." *See* Cmplt. at ¶ 24. As the conduct test focuses on Defendant's activities in the United States, neither the statements made at the June 29, 1995 meeting, the 1995 Information Form, nor allegations regarding "the market" can be used to further Interbrew's claims under U.S. securities laws.

■ Remaining, however, is Interbrew's allegation that Brascan caused similar misrepresentations to appear in Labatt's Annual Reports, filed in the United States with the SEC and relied on by Interbrew's advisors in preparing their Offer to Purchase. Filings with the SEC have been found to support subject matter jurisdiction. *See Itoba,* 54 F.3d at 123 ("SEC filings generally are the type of 'devices' that a reasonable investor would rely on in purchasing securities of the filing corporation. When these United States filings include substantial misrepresentations, they may be a predicate for subject matter jurisdiction." (*citing Psimenos,* 722 F.2d at 1045)).

However, the Second Circuit's reasoning in *Europe and Overseas* is again instructive. There, the court reiterated the traditional requirement under the conduct test "that U.S. activity directly cause the harm to the

---

**1.** Rule 10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would oper-

ate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**2.** While Interbrew's Offer to Purchase was dated June 14, 1995, Interbrew was free to increase or decrease the offering price for Labatt shares at any time prior to the close of Interbrew's tender offer, under both U.S. and Canadian rules. *See* 17 C.F.R. § 240.14e–1(b); Securities Act, R.S.O., Part XX, § 98(4)—(5) (1994) (Can.).

foreign interest ..." and acknowledged that the plaintiff, EOC, relied upon the allegedly misleading information while present in the United States and "such reliance was the direct cause of the loss sustained by EOC." *Europe and Overseas,* 147 F.3d at 129. Nevertheless, the court declined to find jurisdiction "because the surrounding circumstances show that no relevant interest of the United States was implicated." *Id.* at 129. Thus, the question is whether, in addition to Brascan's U.S.-based activity, there is "some additional factor tipping the scales in favor of our jurisdiction...particularly...when the transaction is clearly subject to the regulatory jurisdiction of another country with a clear and strong interest in redressing any wrong." *Id.*

Even assuming this Court were to pierce the corporate veil and find that Brascan can be held accountable for the alleged misrepresentations in Labatt's 1994 SEC filing, the surrounding circumstances make the case for finding jurisdiction tenuous. Although Interbrew does not rely on *Europe and Overseas,* that opinion provides the strongest support for Interbrew's position. Interbrew argues that jurisdiction has been found under the conduct test, in predominantly foreign securities transactions, when, in addition to some incidental "communications with or meetings in the United States," *id.* at 130, there is a further link to the United States, such as harm to a U.S. party or significant economic activity connecting the parties to the United States. *Id.* Interbrew suggests that such a connection exists because Labatt maintains substantial operations in the United States, operations which were a significant factor in Interbrew's decision to purchase the Labatt shares.

In favor of this position, Interbrew cites *AVC Nederland B.V. v. Atrium Inv. Partnership,* 740 F.2d 148 (2d Cir.1984), which

was also cited in *Europe and Overseas.* What "tipped the balance," *Europe and Overseas,* 147 F.3d at 130, in favor of jurisdiction in *Nederland* was that the defendant's partnership invested in real estate located in the United States, a form of economic activity providing a connection between the parties and the United States.[3] Because that factor was absent in *Europe and Overseas,* the court held that it lacked jurisdiction.

Interbrew might argue that its facts are closer to those in *Nederland* than those in *Europe and Overseas.* While this is partially true, *Nederland* is, ultimately, distinguishable. *Nederland* involved an allegedly fraud-tainted deal consummated abroad concerning economic activity connecting both the plaintiff and defendants to the United States. But one of the *Nederland* defendants was a general partnership formed in Georgia, and the plaintiff maintained that much of the negotiation, and all of the alleged misrepresentations, occurred in the United States. These factors are absent here. Thus, as in *Europe and Overseas,* this court lacks jurisdiction. *See also, Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.,* 606 F.2d 5 (2d Cir. 1979) (all parties foreign, jurisdiction declined because conduct in the United States was secondary or ancillary to the alleged fraud).

## IV. Conclusion

The Complaint fails to allege that this Court has subject matter jurisdiction under either the conduct or the effects test, whether applied separately or in combination. For this reason, Defendant's 12(b)(1) motion to dismiss is granted. Because subject matter jurisdiction is based on Plaintiff's Exchange Act claim, the Court declines to exercise

---

**3.** In *Itoba,* the court also sustained jurisdiction. In that case, a Channel Islands company, wholly owned by a Bermuda company, sued a London-based holding company, Lep Group PLC ("Lep"), whose stock traded on the London Exchange. The court found the defendant subject to the securities fraud laws based on submissions of Form 20–F to the SEC. But there, the SEC filings were made in an attempt to create a U.S. market for Lep's shares by issuing American Depository Receipts (ADRs) traded on the NAS-

DAQ exchange. *Itoba,* 54 F.3d at 120. Thus, *Itoba* involved "fraud occurring on an American exchange and persisting abroad that has impacted detrimentally upon thousands of United States shareholders in the defrauded company..." *Id.* at 124. Further, although the parent company of Itoba was based abroad, it traded its stock on the New York Stock Exchange. The court noted that it was this company "which financed the deal and which, with its shareholders, ultimately must bear the loss." *Id.*

jurisdiction over Plaintiff's common law fraud and negligent misrepresentation claims. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir. 1994). The Clerk is directed to close this case.

SO ORDERED: