**NIKKO ASSET MANAGEMENT CO., LTD., on behalf of itself, and as Trustee of Nikko Money Management Fund ("MMF") and PF HMMF, Nikko Asset Management Co., Ltd. Money Management Fund ("MMF"), and PF HMMF, Plaintiffs,**

v.

**UBS AG, UBS Warburg (Japan), Ltd., UBS Warburg, UBS Warburg LLC, UBS AG London Branch, and UBS AG Jersey Branch, Defendants.**

No. 02 Civ.8151 RWS.

United States District Court, S.D. New York.

Feb. 11, 2004.

---

Abbey Gardy byPaul O. Paradis, Evan J. Kaufman, Gina M. Tufaro, Michelle Z. Hall, New York City, Puls Taylor & Woodson by W. Kelly Plus, Brant C. Martin, Fort Worth, TX, for Plaintiffs.

Sullivan & Cromwell by Robert J. Giuffra, Jr., Brent J. McIntosh, New York City, for Defendants.

## OPINION

SWEET, District Judge.

Defendants UBS AG, UBS Warburg (Japan), Ltd. ("UBS Japan"), UBS Warburg, UBS Warburg LLC ("UBS Warburg"), UBS AG London Branch, and UBS AG Jersey Branch ("UBS AG") (collectively "UBS") have moved pursuant to Rule 9(b), 12(b)(1), and 12(b)6, Fed.R.Civ.P., and the doctrine of *forum non conveniens* to dismiss the corrected first amended complaint ("CFAC") of plaintiffs Nikko Asset Management Co., Ltd. ("Nikko"), Nikko Money Management Fund ("MMF"), and PF HMMF ("HMMF"), Nikko Asset Management Co., Ltd., Money Management Fund ("MMF") and PF HMMF (collectively "Nikko"). For the reasons set forth below, the motion is granted.

In June and July 2001, defendant UBS Japan arranged for the sale of two series of credit-linked notes to Nikko in the total amount of JPY (Japanese Yen) 20,000,000,-000, which is alleged to have bought these notes on behalf of two Japanese investment funds. The notes were issued by defendant UBS AG with its subsidiaries, and linked UBS's obligations to pay principal and interest to certain events occurring at Enron Corporation ("Enron"). Such notes were developed and are employed to transfer credit risk.

Whether the purchase and sale of the credit-linked notes ("CLNs") is covered by the federal securities laws in light of the demise of Enron and the alleged knowledge of the defendants of the probability of that demise is the central issue presented by this motion.

458

### The Parties

Nikko is a corporation organized and existing under the laws of the country of Japan, and maintains its principal executive office at 1-1-3, Yurakucho, Chiyoda-ku, Tokyo, Japan. Nikko is an investment trust management company and provides investment management services, managing Japanese equity and fixed income assets for institutional clients and Japanese mutual funds for retail clients.

MMF is a contractual investment trust existing under the investment trust law of Japan and trust clauses with beneficiaries. MMF was operated by Nikko in the custody and safe keeping of Mitsubishi Trust and Banking Corporation based on an agreement between Nikko and Mitsubishi Trust and Banking Corporation.

HMMF is a contractual investment trust existing under the investment trust law of Japan and trust clauses with beneficiaries, operated by Nikko in the custody and safe keeping of Mitsubishi Trust and Banking Corporation based on an agreement between Nikko and Mitsubishi Trust and Banking Corporation.

UBS AG is a corporation organized under the laws of Switzerland with its principal executive offices located at Bahnhofstrasse 45, CH-8098, Zurich, Switzerland. UBS AG is a global, integrated investment services firm involved in all major banking activities, including international investment banking and corporate finance, private banking, institutional asset management and, in Switzerland, retail and corporate banking.

UBS Warburg (Japan) Ltd. ("UBS Warburg Japan") with its principal place of business at East Tower, Otemachi First Square 5-1, Otemachi 1-chome, Chiyoda-ku, Tokyo 100-0004, is a division of UBS Warburg and a wholly owned subsidiary of UBS AG.

USB Warburg is the investment banking arm of UBS AG with its principal place of business at½ Finsbury Avenue, London, EC2M 2PP, United Kingdom. UBS Warburg employs over 17,000 people worldwide and has substantial operations in the United States, Switzerland, Japan, Australia, Hong Kong and Singapore. UBS Warburg's operations include debt and equity finance, advisory services, research, risk management, and securities and foreign exchange. UBS Warburg also offers investors access to private equity and hedge funds. The company works with corporate, institutional, government, and private clients worldwide.

UBS Warburg, LLC is a Delaware Limited Liability Company, authorized to do business in New York. UBS Warburg, LLC is a division of UBS Warburg and a wholly owned subsidiary of UBS AG with its principal place of business at 299 Park Avenue, New York, New York 10171-0026.

UBS AG London Branch ("UBS London") is a wholly owned subsidiary of UBS AG with its principal place of business at½ Finsbury Avenue, London, EC2M 2PP, United Kingdom.

UBS AG Jersey Branch ("UBS Jersey") is a wholly owned subsidiary of UBS AG and serves as UBS AG's branch in the Channel Islands (U.K.) with its offices located at 24, Union Street, St. Helier, JE 2 3RF. (The defendants referred to herein are collectively referred to as "UBS" or "Defendants").

### The Transaction

On June 18, 2001, MMF purchased JPY 10,000,000,000 of UBS AG .89% Fixed Rate Notes, Series No. 696, Tranche 1, which had an issue date of June 21, 2001 and a maturity date of June 17, 2002 (the "June Notes") from UBS Warburg Japan constituting a purchase of 100% of the

outstanding issue of the June Notes. (CFAC ¶ 11).

On July 26, 2001, MMF purchased JPY 9,000,000,000 of UBS AG .89% Fixed Rate Notes, Series No. 726, Tranche 1, which had an issue date of August 7, 2001 and a maturity date of July 25, 2002 (the "July Notes") from UBS Warburg Japan. (CFAC ¶ 12).

On July 26, 2001, HMMF purchased JPY 1,000,000,000 of UBS AG .89% Fixed Rate Notes, Series No. 726, Tranche 1, which had an issue date of August 7, 2001 and a maturity date of July 25, 2002 (the "July Notes") from UBS Warburg Japan. By this transaction and the purchase described in the preceding paragraph, Nikko MMF and HMMF purchased 100% of the July Notes issue. (CFAC ¶ 14). The June Notes and the July Notes are collectively referred to as "the Notes", "Credit Linked Notes" or the "CLNs".

The CLNs listed Enron as the "Reference Entity" and provided that if Enron suffered a Credit Event, the Notes may diminish in value according to a formula in the Pricing Supplements that essentially tracked the value of certain specified Enron credit obligations. (CFAC Exs. 3, 5 (Pricing Supps.) at 1, 3, 10). The Pricing Supplements stated that the value of the Notes might "be zero" if a Credit Event occurred. (CFAC Exs. 3, 5 (Pricing Supps.) at 1). The Supplements further state that "the issuer makes no representations as to the future performance of the Notes either in absolute terms or relative to competing investments," and that "[t]here is no guarantee, protection or assurance for purchasers of the Notes in respect of the credit or performance of the Reference Entity or Reference Obligation." *Id.* at 13. The Notes were one of several types of notes issuable under a UBS Warburg programme, and Nikko bought all of the CLNs issued under the

Pricing Supplements for these particular CLNs with Enron as the Reference Entity. (CFAC ¶¶ 11, 13, Ex. 1 (Info.Mem.) at 69–71).

The solicitation of the purchases of, and the sales of, the June Notes and July Notes to MMF and HMMF were made pursuant to the (i) Information Memorandum; (ii) June Notes Term Sheet; (iii) June Notes Pricing Supplement; (iv) July Notes Term Sheet; (v) July Notes Pricing Supplement (Exhibits 1–5 to the CFAC). The Information Memorandum, June Notes Term Sheet, June Notes Pricing Supplement, July Notes Term Sheet, and July Notes Pricing Supplement are hereinafter sometimes collectively referred to as the "CLN Offering Memoranda." (CFAC ¶ 15).

UBS Warburg Japan dealt directly with Nikko and MMF and HMMF, and sold them the UBS June and July Notes in Japan in June and July, 2001. (CFAC ¶ 18).

According to the Information Memorandum and the purchase transaction confirmations, UBS Warburg acted as the seller of the June Notes and July Notes in connection with Nikko MMF"s and HMMF"s purchase of those notes. UBS AG, through UBS Warburg, acted as (1) arranger and dealer for the June Notes; (2) arranger and dealer for the July Notes; and (3) London listing agent for the UBS AG U.S. $25,000,000,000 Euro Note Programme (the "Programme"). (CFAC ¶ 19).

### The Programme and the Offering Materials

UBS AG, acting through its Jersey Branch, issued and, through UBS Warburg and UBS Warburg Japan, sold tens of millions of dollars of UBS CLNs through UBS AG's U.S. $25,000,000,000 Euro Note Programme (the "Note Pro-

gramme"). (CFAC ¶ 88). In accordance with this Note Programme, various tranches and series of notes were issued and sold in the United States and Japan and on a worldwide basis. Sales were permitted as part of a worldwide integrated public offering. (CFAC Exh. 1 at 79).

UBS AG, acting through its Jersey Branch, was the "issuer" of the CLNs. (CFAC ¶ 17, Exh. 3, 4). UBS AG, through UBS Warburg, acted as arranger and dealer for the CLNs and London Listing Agent for the Note Programme. (CFAC ¶ 20). UBS Warburg, LLC served as a dealer for the Note Programme. (CFAC ¶ 21). Defendant UBS London served as an Issuer for the Note Programme and Calculation Agent for the CLNs. (CFAC ¶ 22). UBS Jersey served as an Issuer of the Note Programme. (CFAC ¶ 17).

According to Nikko, UBS's Information Memorandum, Pricing Supplements, Term Sheets and oral communications, in connection with the solicitation and sale of the CLNs (collectively, the "Offering Memoranda"), did not disclose material facts known to UBS AG and the UBS related entities concerning the true financial condition at Enron. (CFAC ¶¶ 102–109).

UBS Warburg served as a dealer for the UBS AG U.S. $25,000,000,000 Euro Note Programme established in June 2001 by UBS AG (the "Issuers") as a framework for "issuing notes and other debt instruments." (CFAC ¶¶ 20, 21, 22, Ex. 1).

Under the Programme, the Issuers could issue many types of notes, including various derivative instruments (*i.e.*, instruments whose value is linked to some outside factor specified in the notes' documentation). (CFAC Ex. 1 (Info Mem. at 70–71)). Notes issued under the Programme were issued in different series. (CFAC Ex. 1 (Info Mem.) at 8).

The Information Memorandum provided only "General Terms and Conditions," and each series of notes was issued pursuant to a Pricing Supplement, "which will contain the information which specifically relates to that issue of Notes." (CFAC Ex. 1 (Info.Mem.) at 12). The Information Memorandum provided that "[i]n relation to any issue of Notes, the Pricing Supplement may contain provisions which supplement, modify or replace all or any General Terms and Conditions for the purpose of that issue alone." (CFAC Ex. 1 (Info Mem.) at 12).

The Information Memorandum also established mandatory provisions governing all notes issued under the Programme, including that neither the Information Memorandum nor "any other information supplied in connection with the Programme or any Notes . . . should be considered as a recommendation or constituting an invitation or offer" to purchase securities. (CFAC Ex. 1 (Info Mem.) at 3).

The Information Memorandum issued in connection with the Programme, including the solicitation and sale of the June Notes and July Notes, provided:

Each of the Issuers and the Guarantor have jointly and severally confirmed to the dealers (the "Dealers") named under "Selling Restrictions" that (i) this Information Memorandum is true and accurate in all material respects and not misleading; (ii) there are no other facts in relation to the information contained or incorporated by reference in this Information Memorandum the omission of which would, in the context of the issue of the Notes, make any statement in the Information Memorandum misleading in any material respect; and (iii) all reasonable inquiries have been made to verify the foregoing. Each of the Issuers and the Guarantor have jointly and sev-

erally further confirmed to the Dealers that, in relation to any Notes issued under the Programme, this Information Memorandum (together with the relevant Pricing Supplement) contains all such information as investors and their professional advisers would reasonably require, and reasonably expect to find, for the purpose of making an informed assessment of the assets and liabilities, profits and losses and the financial position of each of the Issuers, the Guarantor and their respective subsidiaries and of the rights attaching to the relevant Notes.

\*        \*        \*        \*        \*        \*

[T]o the best of the knowledge and belief of the Issuers and the Guarantor (who have taken all reasonable care to ensure that such is the case) the information contained in this Information Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information. (CFAC Ex. 1 at 2).

The Information Memorandum also states in relevant part:

[ ]each Issuer is obliged to prepare listing particulars that contain all information which investors and their professional advisers would reasonably require and reasonably expect to find there, in order to make an informed assessment of the assets and liabilities, financial position, profits and losses and prospects of such Issuer and the rights attaching to the Notes. In determining what information is so required or is so expected, regard may be had to (1) the nature of the Notes, (2) the nature of the persons likely to consider their acquisition, and (3) certain information available to investors and their professional advisers.

(CFAC Ex. 1 at 5).

Under the heading "Use of Proceeds," the Information Memorandum states in relevant part:

[t]he net proceeds of the issue of each Series or Tranche of Notes will be used by the relevant Issuer towards meeting the general financing requirements of the UBS Group outside Switzerland.

(CFAC, Ex. 1 at 33).

### The UBS United States Activities Alleged

On June 9, 1999, UBS AG subsidiaries PaineWebber and UBS PaineWebber International (U.K.) Ltd. performed underwriting services for the Initial Public Offering of Azurix, a company created by Enron and incorporated in the United States and is charged with knowing, or negligence in not knowing, that Enron used Azurix and its U.S. Enron Special Purpose Entities ("SPEs"), the Marlin Water, Atlantic Water, and Bristol Water Trusts (which were Delaware business trusts), to keep billions of dollars in debt off Enron's balance sheet. UBS also learned that Enron owed a massive repayment obligation in connection with Marlin's funding based upon equity "triggers" that were not disclosed to the public.

UBS was directly involved with LJM Cayman ("LJM"), an Enron SPE run by Enron insiders from Houston, Texas. UBS was part of several LJM transactions that furthered Enron's fraud. UBS, Enron, and LJM hedged Enron's equity position in Rhythms Net Connections, Inc., a transaction conceived, planned, and executed in the United States.

UBS facilitated equity swap transactions and performed key underwriting services for transactions known as the "Raptors" which concealed from Enron's balance sheet almost $1 billion in investment losses, and Enron, with the direct participation of UBS, terminated the Raptor SPEs in the third quarter of 2001.

UBS was involved in stock purchase agreements referencing and involving a UBS account in New York City, equity forward confirmations concerning over 1 million shares of Enron stock, and payments were made to UBS concerning the Raptors. Correspondence from UBS Warburg, LLC's confirmed UBS's role in a Raptor transaction to sell 706,274 Enron shares and receive over $50 million from Enron, and wire transfers amounting to tens of millions of dollars were made from Enron to UBS accounts in the U.S., including New York.

According to Nikko, because of its close working relationship with Enron, UBS knew that Enron's reported financial results were fraudulent and that during late 2001 Enron was in an ever-worsening financial condition and obtained knowledge about Enron's true financial affairs by, among other things: (i) financing, supporting, and servicing Enron's Special Purpose Entities ("SPEs"); (ii) engaging in transactions enabling Enron to hedge its equity positions in violation of accepted accounting principles; (iii) serving as underwriter of Enron securities, or securities issued by Enron SPEs; (iv) providing numerous investment banking services for Enron; and (v) serving as Enron's exclusive brokerage firm authorized to act as the administrator of Enron's employee stock option plan and deferred benefit plan. (CFAC ¶ 25).

According to Nikko, to protect itself, UBS devised and implemented a scheme to fraudulently transfer JPY 20 billion of its Enron credit risk from itself to MMF and HMMF by soliciting of the purchase of, and sale of, the June Notes and July Notes. UBS perpetrated its scheme to sell these notes by means of a prospectus and oral communications which misrepresented and omitted to disclose material facts. UBS's activities in the United States directly caused the Nikko Management losses and UBS's activities were more than merely preparatory to the marketing, sale, and issuance of the CLNs to MMF and HMMF. If not for UBS's activities in the United States involving Enron, UBS would not have been able to perpetrate the CLNs scheme, and would not have fraudulently, recklessly and/or negligently transferred the Enron credit risk from itself to MMF and HMMF, thereby directly causing the damages suffered by the Plaintiffs. (CFAC ¶ 27).

In addition, UBS AG, and its U.S. based subsidiaries, UBS PaineWebber and defendant UBS Warburg LLC, earned substantial fees in the U.S. from Enron, (CFAC ¶¶ 67–71), and attempted to offload such debt through the sale of hundreds of millions of dollars worth of Enron Zero Coupon Notes in the United States. (CFAC ¶¶ 75–79).

### The Damages

On October 16, 2001, Enron reported that it would reduce shareholder equity by $1.2 billion. (CFAC ¶ 65). Moody's downgraded Enron's debt rating to junk status on November 28, 2001. One week later, Enron filed for bankruptcy. According to the CFAC, MMF and HMMF incurred JPY 18.6 billion in direct and consequential damages as a result of the fraudulent, reckless and/or negligent conduct engaged in by UBS AG and related UBS entities. (CFAC ¶ 24).

### The Causes of Action

After detailing the allegations supporting the theory of the CFAC, the Plaintiffs allege six causes of action:

(1) Violations of Section 10(b) of the Exchange Act and Rules 10b–5(a) and (c) arising out of the scheme to defraud. (CFAC ¶¶ 130–139).

(2) Violations of Section 10(b) of the Exchange Act and Rule 10b–5(b) arising out of the creation of a fraudu-

lent market, untrue statements of material facts and omissions to state material facts. (CFAC ¶¶ 140–150).

(3) Violation of Section 20(a) by UBS AG of the Exchange Act arising out of its control of its subsidiaries. (CFAC ¶¶ 151–155).

(4) Violation of Section 12(a)2 and 15 of the Securities Act of 1933 arising out of fraud in connection with a public offering. (CFAC ¶¶ 156–165).

(5) Fraud and deceit. (CFAC ¶¶ 166–184).

(6) Negligent misrepresentation. (CFAC ¶¶ 185–189).

### Nikko Has Acquired Standing

Initially UBS sought dismissal under Fed.R.Civ.P. 17(a) on the grounds that neither Nikko nor the MMFs have standing to bring this action on the grounds that each MMF is a contractual investment trust existing under the Investment Trust Law of Japan and under the Investment Trust Law and Trust Law of Japan, a contractual investment trust is not a distinct juridical entity and is not the trustee of an express trust (*i.e.,* of the MMFs) or "a party in whose name a contract had been made for the benefit of another" (*i.e.,* for the benefit of an MMF).

Upon learning of the position taken by UBS, counsel for Nikko determined that their initial information that Nikko was the trustee of the MMFs was incorrect and that the Mitsubishi Trust and Banking Corporation ("Mitsubishi") was the trustee. Mitsubishi has ratified Nikko's action and agreed to be bound by any final judgment entered.

UBS no longer contests the standing issue but notes that the Plaintiffs do not dispute that the two Japanese money managements funds ("MMFs") are not juridical entities with the capacity to bring suit.

As such they are not proper parties to these suits and will be therefore dismissed. *See Roby v. Corp. of Lloyd's,* 796 F.Supp. 103, 106–07 (S.D.N.Y.1992), *aff'd,* 996 F.2d 1353 (2d Cir.1993).

### This Court Lacks Jurisdiction

UBS has moved to dismiss under Fed. R.Civ.P. 12(b)(1), arguing that the Court lacks subject matter jurisdiction over the foreign transactions involved in this litigation. Nikko bears the burden of "showing by a preponderance of the evidence that subject matter jurisdiction exists." *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003) (*quoting Lunney v. United States,* 319 F.3d 550, 554 (2d Cir.2003)). Further, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* (*quoting Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998)). "On a Rule 12(b)(1) motion, the Court need not accept as true contested jurisdictional allegations and may resolved disputed jurisdictional facts by reference to affidavits and other material outside the pleadings." *Societe Nationale d'Exploitation Industrielle v. Salomon Bros. Int'l Ltd.* 928 F.Supp. 398, 402 (S.D.N.Y.1996) (*citing Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992)); *see also Scherer v. Equitable Life Assurance Society of U.S.,* 347 F.3d 394, 401–02 (2d Cir.2003) ("when a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, Fed.R.Civ.P. 12(b), the court may inquire, by affidavits or otherwise, into the facts as they exist.") (*quoting Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011, 91 L.Ed. 1209 (1947) (citations omitted), *overruled on other grounds, Larson v. Domestic and Foreign Commerce*

*Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)).

As this Court held in *Societe Nationale*, The securities and commodities laws are silent regarding the issue of extraterritorial jurisdiction. *See, e.g., Alfadda v. Fenn*, 935 F.2d 475 (2d Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991). Therefore, when faced with transactions that are "predominantly foreign," the Court "must seek to determine whether Congress would have wished the precious resources of United States courts ... to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.) (Friendly, J.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). Thus, in meeting Congress's intent not "to allow the United States to be used as a base for manufacturing fraudulent security devices for export," *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir.1975), "[t]he issue then is whether the fraud alleged has sufficient contacts with the United States to invoke the federal securities and commodity laws or whether it is 'predominantly foreign' in nature." *Mormels v. Girofinance, S.A.*, 544 F.Supp. 815, 817 (S.D.N.Y.1982) (Weinfeld, J.).

928 F.Supp. at 402. To determine whether a district court has subject matter jurisdiction over securities fraud actions involving predominantly foreign transactions, the Second Circuit has "consistently looked at two factors: (1) whether the wrongful conduct occurred in the United States; and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *S.E.C. v. Berger*, 322 F.3d 187, 192 (2d Cir.2003). In evaluating these two factors, this Circuit applies "what are known respectively as the 'conduct test' and the

'effects test.'" *Id.* at 193. Courts, however, "need not reach the question whether the effects test provides an independent basis for jurisdiction when there is jurisdiction under the conduct test." *Id.* at 195 (*quoting Psimenos v. E.F. Hutton & Co., Inc.* 722 F.2d 1041, 1045 (2d Cir.1983)).

Here, Nikko does not identify any domestic effects of the alleged fraud other than the assertion, unsupported by factual allegations, that "[d]efendants' illegal conduct had a substantial impact upon interstate commerce." (CFAC ¶ 6). There is no allegation that any U.S. person was harmed by the MMFs' collapse, or that the Notes were ever sold to a U.S. person or traded on a U.S. exchange. Nikko has therefore failed to establish jurisdiction under the effects test. *See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 128 (2d Cir.1998) (jurisdiction is lacking where "the plaintiff is a Panamanian corporation; the individual ... who ultimately suffered any losses, is a Canadian citizen; the securities are not traded on a U.S. exchange; and no effect on a U.S. affiliated company is alleged").

As a consequence, "[t]o support the assertion of federal jurisdiction, the plaintiff must put forward allegations of conduct in the United States of sufficient centrality to the claim of fraud to warrant an exercise of such jurisdiction." *Societe Nationale*, 928 F.Supp. at 406.

In *Berger*, the Second Circuit stated its standard for exercising subject matter jurisdiction over claims of securities fraud based on purported domestic conduct:

jurisdiction exists *only when substantial acts* in furtherance of the fraud were committed within the United States, ... [T]he test is met whenever (1) the defendant's activities in the United States were more than "merely preparatory" to a securities fraud conducted elsewhere

*and* (2) the activities or culpable failures to act within the United States "directly caused" the claimed losses.

*Berger,* 322 F.3d at 193 (internal quotation marks and citations omitted; emphasis added); *see also Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 n. 24, 987, 993 (2d Cir.1975) (Friendly, J.) ("the antifraud provisions of the federal securities laws ... [d]o not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States *directly caused* such losses.") (emphasis added).

The U.S. conduct that Nikko alleges in this action is UBS's alleged transactions with Enron, which it is claimed provided UBS with advance knowledge of Enron's impending bankruptcy. UBS Warburg LLC, a dealer for the Euro Note Programme, is the only U.S. entity among the Defendants. It is not alleged that UBS Warburg LLC was involved with the issuance of these Notes. The fact that "one defendant ... is a U.S. citizen" does not suffice to provide this Court jurisdiction. *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1016 (2d Cir.1975). However, Nikko asserts that "[t]he UBS CLNs were part of UBS's fraudulent dealings with Enron in the United States, were devised and executed in the United States and were intertwined with Enron in the United States." (CFAC ¶ 85).

According to the CFAC, the Plaintiffs, all Japanese entities, were defrauded by a transaction in Japan by UBS Japan, another Japanese entity, to the detriment of Japanese investors. (CFAC ¶¶ 97–101, 112). The fraud is alleged because UBS Japan did not warn Nikko of Enron's financial crisis. (CFAC ¶ 107). The U.S. conduct alleged is that UBS purportedly learned in the U.S. in the course of its Enron-related transactions, that Enron's financials were false, which UBS Japan then allegedly failed to disclose to Nikko during the Japanese transaction between Nikko and UBS Japan. (CFAC ¶ 106).

In circumstances involving allegations of U.S. ties more substantial than those alleged here, the Second Circuit has ruled that subject matter jurisdiction was lacking. In *Europe & Overseas Commodity Traders,* a § 10(b) action, the Second Circuit ruled that the district court lacked jurisdiction, even though the defendants solicited the plaintiff's representative to buy the allegedly fraudulent securities, and accepted his order for them, while the representative was in the United States. *See* 147 F.3d at 127–31. The representative's presence in the United States "did not bring this otherwise entirely foreign transaction within the antifraud provisions of U.S. securities law." *Id.* at 131. Here, by contrast, there is no specific allegation that the transactions at issue—as opposed to the general Programme—involved any U.S. conduct.

Under the standard established by the Second Circuit and applied by this Court in *Societe Nationale,* the federal courts have no jurisdiction over the two entirely foreign transactions alleged in the CFAC. *See also e.g., Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.,* 606 F.2d 5, 8–10 (2d Cir.1979) (holding that jurisdiction was lacking where defendants' Minneapolis office was aware of the fraud and some of the fraudulent securities eventually were sold to U.S. residents); *Bersch,* 519 F.2d at 985, 987 n. 24 (holding that jurisdiction was lacking despite substantial New York-based activities in preparation of the alleged fraudulent securities transaction); *Interbrew S.A. v. Edperbrascan Corp.,* 23 F.Supp.2d 425, 432 (S.D.N.Y.1998) (holding that jurisdiction was lacking even though the transaction at issue was the purchase of a company with substantial U.S. opera-

tions); *cf. Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 905–07 (5th Cir.1997) ("adopt[ing] the Second Circuit's test," and applying that "restrictive" test to dismiss a securities fraud claim even though "one of the key events—if not the key event—is the alleged scheme" occurred in the United States).

Nikko has alleged that Enron was a large UBS client from which UBS earned millions of dollars in fees, in return for which Enron pressured UBS to lend it approximately $300 million to fund its operations and perpetuate its fraud. (CFAC ¶¶ 67–70). In support of its theory of the complaint Nikko has further alleged that during May 2001, prior to the issuance of the UBS CLNs, UBS Warburg LLC served as Joint Lead Manager and as Initial Purchaser for three Citigroup credit linked notes tranches that closely resembled the UBS CLNs. (CFAC ¶¶ 80–83). As a result of working on the Citigroup credit linked notes transaction, UBS knew that the CLN structure enabled Citigroup to transfer hundreds of million of dollars of Enron risk from Citigroup to third party purchasers. UBS applied what it had learned from Citigroup, to transfer its Enron risk of loss through the sale of its own credit linked notes.

In addition to the loans that UBS advanced to Enron (that were the subject of the Credit Linked Notes), UBS AG purchased $250,000,000 face amount and UBS Warburg LLC purchased $800,000 face amount, of Enron Zero Coupon Notes in or about February 2001. (CFAC ¶ 79). During 2001, when UBS suspected that Enron would default on its outstanding debt, the Defendants attempted to sell all of their Enron Zero Coupon Notes into the United States Public market, notwithstanding that the Enron Zero Coupon

Notes were purchased only months earlier. (CFAC ¶ 79).

Nikko agrees that under the Second Circuit's "conduct test," a district court properly exercises subject matter jurisdiction over foreign purchasers of securities where a defendant's activities in the U.S. were more than "merely preparatory," and its culpable conduct (or omissions) in the U.S. "directly caused" the claimed losses. *Berger*, 322 F.3d at 193; *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1336–37 (2d Cir.1972). (Pltf. Memo. Opp. at 10–11).

In support of its allegations Nikko points to the economic activity in the United States which it maintains is material to the alleged securities fraud involving the CLNs that UBS loaned to Enron and served as a joint lead manager and initial purchaser of the hundreds of millions of dollars credit linked notes issued by Citigroup. (CFAC ¶¶ 81–82). According to Nikko, the totality and materiality of UBS's conduct distinguishes its action from cases cited by Defendants.

Here, as in *Societe Nationale*, there is no dispute that the two Japanese transactions in Yen-denominated CLNs occurred in Japan. *Id.* at 403–04. Here, unlike in *Societe Nationale*, there is no allegation that there was any U.S. structuring, marketing, or transactional activity in connection with the Notes Nikko bought from UBS Japan, *Id.* at 404, or indeed any U.S. activity at all, leaving aside the fact that the U.S.D. Bank Trust Association is alleged to have been the Registrar for the Programme (CFAC ¶ 95).

In searching for a jurisdictional hook, Nikko asserts that (i) the Note transactions were part of the Programme, (ii) "a substantial amount of conduct … material to the Note Programme" occurred in the United States, and (iii) the Programme's U.S. contacts therefore suffice to provide

jurisdiction. (Pltf. Memo Opp. at 11). However, the Programme itself had no connection to Enron. As described in the Information Memorandum, the UBS Programme allowed various UBS entities to issue many types of debt securities with a wide variety of terms and conditions in myriad geographic locations, including the United States, but this action alleges fraudulent conduct with regard to only two specific Notes issued under the Programme. (CFAC ¶¶ 2, 102–09). Taking Nikko's allegations as true, the Programme is an example of non-fraudulent preparatory activity, and does not suffice to create jurisdiction. *See Europe & Overseas,* 147 F.3d at 129; *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985–88 (2d Cir.1975).

Nikko also asserts that UBS Warburg LLC, the lone U.S. defendant in this action, was involved in the issuance of these Notes because UBS Warburg LLC was listed in the Information Memorandum as a potential dealer of securities under the Programme. (Pltf. Memo. Opp. at 11). However, as disclosed in the Pricing Supplements, UBS Warburg LLC was not a dealer, and did not play any other role, in issuing the Notes Nikko bought in Japan. (CFAC Exs. 3, 5 (Pricing Supps.) at 1, 5). The allegation that UBS Warburg LLC was authorized to deal securities under the Programme does not constitute UBS Warburg as the dealer for the Notes sold to Nikko in Japan.

Domestic conduct that is "merely preparatory to a securities fraud elsewhere will not implicate our antifraud laws." *Europe & Overseas Commodity Traders,* 147 F.3d at 129; *accord Societe Nationale,* 928 F.Supp. at 405. The alleged fraud happened in Japan; at most, the knowledge that made the transaction fraudulent was gained in the United States. Because the UBS activity in the United States, even if fraudulent, was merely preparatory, there is no conduct in the United States that directly caused the damage of which Nikko complains.

Taking all of Nikko's allegations as true, its losses were also not "directly caused" by any fraudulent conduct in the United States. Nikko neither had contact with Enron nor held any Enron-issued securities, and Enron was not involved in these Note transactions. Enron's financial fraud was at most an indirect cause of Nikko's losses, whereas the Note transactions, conducted in Japan between Japanese financial institutions for the benefit of Japanese investors was the direct cause of Nikko's losses. (CFAC ¶¶ 97–101, 112). Just as in *Societe Nationale,* "even the most generous interpretation of [Plaintiffs'] assertions concerning [U.S. contacts] merely establishes that acts in the United States helped make the gun whence the bullet was fired from places abroad." *Societe Nationale,* 928 F.Supp. at 405 (*quoting Bersch,* 519 F.2d at 987).

Nikko has therefore failed to "put forward allegations of conduct in the United States of sufficient centrality to the claim of fraud to warrant an exercise of jurisdiction." *Id.* at 406. "Because no federal question is presented under the federal laws under which jurisdiction is asserted, and because no diversity jurisdiction is asserted, the Court lacks subject matter jurisdiction, and the federal law claims will be dismissed." *Id.* at 402. Further, Nikko's tort claims for fraud and negligent misrepresentation are also dismissed pursuant to 28 U.S.C. § 1367(c)(3) and *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

*Conclusion*

For the reasons set forth above, the motion to dismiss for lack of subject mat-

ter jurisdiction is granted. Submit judgment on notice.

It is so ordered.